1
2  **Richard L. Nelson**
   **ABA No. 0209036**
3  **Baxter Bruce & Sullivan, P.C.**
   **P.O. Box 32819**
4  **Juneau, Alaska 99803**
   **phone: (907) 789-3166**
5  **fax: (907) 789-1913**
   **rnelson@baxterbrucelaw.com**
6  **Attorneys for Plaintiffs**
7
8

**FILED**

DEC **2 8** 2005

UNITED STATES DISTRICT COURT
DISTRICT OF ALASKA
By_____Deputy

9          **IN THE UNITED STATES DISTRICT COURT**
              **FOR THE STATE OF ALASKA**
10

11  **JOERGEN SCHADE  and ROBERT**          )
    **MERRELL**                              )
12                                           )
13              **Plaintiffs,**              )
                                             )
14  **vs.**                                  )
                                             )
15                                           )
    **KETCHIKAN GATEWAY BOROUGH and** )
16  **CHARLES POOL**                         )
                                             )
17              **Defendants**               )    **Case No. J05 - 0017 CV (JKS)**
18  _____
19

20  **FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

21

22  Joergen Schade and Robert Merrell allege:

                                **Parties**

23      1. Joergen Schade ("Schade") is an individual residing in Mercer Island, Washington.

24      2. Robert Merrell ("Merrell") is an individual residing in Seattle, Washington.

25      3. Ketchikan Gateway Borough ("KGB") is a borough organized under the laws of the
26
           State of Alaska.
27
        4. Charles Pool ("Pool") is an individual residing in Ketchikan, Alaska.
28

29

30

BAXTER BRUCE & SULLIVAN P.C.
P.O. Box 32819, Juneau Alaska 99803
Ph: (907) 789-3166
Fax: (907) 789-1913

   
## Jurisdiction and Venue

5. This Court has original jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332, as this suit is between citizens of different states and the amount in controversy exceeds the sum of $75,000, exclusive of interest and costs.

6. This Court also has original jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 because the suit arises under the Constitution of the United States. As to state law claims herein, such matters are within this Court's ancillary jurisdiction.

7. Venue is proper in this Court pursuant to 28 U.S.C. § 1391 (b).

## Preliminary Statement

8. This action is brought by Schade and Merrell for declaratory judgment and injunctive relief due to the existence of an actual controversy arising out of KGB's attempt to consummate an improper sale of certain waterfront property. Schade and Merrell, who are out-of-state residents, placed the highest and second-highest bids, respectively, at the KGB public auction for the parcel in question. They now seek to enjoin KGB's wrongful attempt to transfer the property to a lower bidder, Pool, who is a local resident. Schade and Merrell also seek a judicial declaration: (a) that the offending portions of the authorizing resolution for the sale be set aside, negating any sale or transfer to Pool, and allowing the auction to stand, with the property going to the highest bidder, Schade; or, alternatively, (b) that the authorizing resolution in its entirety, including the auction and any subsequent sale to Pool based upon it, be set aside and that the auction be rescheduled and conducted lawfully, without improper preference in favor of any bidder or group of bidders.

## General Allegations

9. On August 4, 2005, KGB conducted a public outcry auction (the "First Auction") of certain parcels of land on the east side of Ward Cove, including the parcel in question, B-17, Tract 3017 portions of USS 1208, USS 1508 wft and ATS 1c2 at 6500 North Tongass Highway, Ketchikan, Alaska ("B-17"). The sale was supposed to be conducted under Resolution 1881 passed by the KGB Assembly (the "First Resolution").

BAXTER BRUCE & SULLIVAN P.C.
P.O. Box 32819, Juneau, Alaska 99803
Ph: (907) 789-3166
Fax: (907) 789-1913

10. At this time, Schade and Merrell had never met, and did not know of each other until much later. However, despite being among the first people to express an interest in the bid process, neither Schade nor Merrell was given timely notice of the auction. They only learned of the scheduled auction by initiating calls themselves to KGB, leading them to believe that their participation was not really desired by some people in KGB. They then learned that the parcels were initially to be offered together as a unit in a bulk sale to the highest bidder. If the bulk sale was not successful, the sale of each individual parcel to the highest bidder would be final, provided KGB had received the minimum bid it had set for that parcel. The minimum bids were set for each parcel based on the January 31, 2005 appraised value assessed by KGB (the "Minimum Bid"). Bid documents, which specified the Minimum Bids and set forth the rules of the auction were requested by and received by both Schade and Merrell.

11. Schade chose to attend the First auction. Merrell chose not to attend the First Auction because of the minimum bid requirement, but later submitted a written offer for B-17 to KGB after the First Auction was over and he learned the parcel had not been sold.

12. At the First Auction, the bulk sale was not successful. Therefore, the parcels were offered individually. All but four of the parcels were sold in that fashion. At first, no bids were received on the four remaining parcels, including B-17. However, before the bidding ended, the KGB officials in charge of the auction hurriedly huddled together in private and changed the rules on the spot, saying that bids lower than the Minimum Bids would be received, notwithstanding the rules specified in the First Resolution. Upon information and belief, no new resolution was passed at that time approving this change. Based upon this unapproved *ad hoc* procedure, lower bids were received on the four parcels.

13. As to B-17, the high bid received during this new round was by Pool in the amount of $600,000. This was far below the Minimum Bid set for that parcel under the First Resolution---$1,090,700. Although Schade was interested in acquiring B-17, he waited to see if anyone was willing to bid higher and closer to the original Minimum Bid before entering the process. However, no one did. Because Pool's bid was little

BAXTER BRUCE & SULLIVAN P.C.
P.O. Box 32819, Juneau, Alaska 99803
Ph: (907) 789-3166
Fax: (907) 789-1913

more than half the Minimum Bid, Schade was confident Pool's bid would not be accepted, even if the spur-of-the-moment changes to the auction rules were legitimate.

14. After being informed that the First Auction was over and that Pool's bid had not been accepted, Schade and Merrell each believed he would have a better chance of obtaining B-17 at a more favorable price because the Assembly would have incentive to reduce the Minimum Bid or otherwise modify the terms. They still had not met and did not know of each other's interest in the property.

15. Following the First Auction, in a letter to KGB on August 10, 2005, Merrell submitted on behalf of his business, Mariner Properties, LLC, for which he was the managing member, an offer of $934,830 for B-17, accompanied by a non-refundable deposit check of $50,000. This offer was to be presented to the KGB Assembly on August 15th. However, KGB essentially ignored the offer--its only response to the offer on B-17 was to return the check without comment or explanation.

16. However, unknown to Schade and Merrell and without any prior public disclosure, at least certain members of the Assembly apparently were already formulating plans to grant a preference, in the form of a right of first refusal in any later public auction, to Pool and to the others who had placed the high bids on these parcels in the First Auction, regardless of how far below the Minimum Bids. Although this would appear highly illogical if the KGB were seeking to maximize the proceeds from sale of these parcels, the motivation became clear only after the fact. Upon information and belief, Pool and the others who had made the insufficient bids at the First Auction on the remaining four parcels were all local residents and KGB intended to give them a significant advantage at a new auction.

17. Had Schade and Merrell been provided fair notice at the First Auction of this intention, they would clearly have bid on B-17 and made sure that the bids were higher than Pool's, even if not accepted by KGB, so they would not be placed at an unfair disadvantage in any future auction. Instead, they relied on the publicly declared rules of the First Auction which (a) did not allow receipt of bids lower than the Minimum Bid and (b) gave no indication of intended favoritism or discrimination as to any

BAXTER BRUCE & SULLIVAN P.C.
P.O. Box 32819, Juneau Alaska 99803
Ph: (907) 789-3166
Fax: (907) 789-1913

bidder or class of bidders. They expected the parcel would later be offered for public sale again, at which time they would have an equal chance with all other participants.

18. Schade and Merrell later learned that, at the KGB Assembly meeting on August 15, 2005, a motion was made to put the four remaining properties, including B-17, up for sale by open bid process for fair market value (the "Second Auction"). Upon information and belief, if this original motion had passed, Schade and Merrell would at least have had an equal opportunity with all other bidders.

19. However, still unknown to them at the time, a substitute motion was proposed after further discussion which brought the favoritism to the forefront. Resolution 1906 Amended (the "Second Resolution") introduced the new concept of granting rights of first refusal at the Second Auction in favor of the high bidders on the unsold parcels. The Second Resolution apparently did not pass until September 6, 2005, approximately two weeks into the bid process, with bid documents already having been circulated, for the Second Auction. Those documents gave no hint that rights of first refusal would be granted to anyone. Nor were any addenda to the documents ever given to Schade or Merrell notifying them of such rights. Consequently, they were led to believe that the new auction would also be fair and equal to all bidders--neither of them was properly and timely advised of the belated insertion of these preferential rights of first refusal.

20. Schade and Merrell only discovered after the fact that, as to these bids, which had not been authorized by the First Resolution, KGB cited them and named those exact amounts in the Second Resolution, as the minimum bids (the "Revised Minimum Bids") for the Second Auction. If no bids were received above those amounts, the area residents who had made those bids in the First Auction were assured of receiving the parcels, per Section 1C of the Second Resolution. Although that created an improper preference for those bidders, at least free and even-handed competitive bidding might have been expected to take place above those amounts. However, the preference did not stop there. The Second Resolution went further:

> "If a bid is received in excess of that expressed in Section 1 (A) *[i.e., in excess of the bids proposed in the second round of the First Auction]*, the people who submitted those proposals will have a right of first refusal to purchase the property." (*parenthetical added*).

BAXTER BRUCE & SULLIVAN P.C.
P.O. Box 32819, Juneau Alaska 99803
Ph: (907) 789-3166
Fax: (907) 789-1913

Although this provision of the Second Resolution was worded in a confusing way, it later became clear that what KGB intended was for Pool (like the other local bidders) to have a right of first refusal: (a) regardless of whether he even placed a bid in the Second Auction, (b) regardless of whether he was outbid in the Second Auction, (c) regardless of by how much he was outbid in the Second Auction, and (d) regardless of whether other higher offers had previously been received by KGB even before the Second Auction.

21. As a result, the Second Auction was not a true auction at all. Nor was it designed to achieve the highest price for KGB. If anything, it discouraged bidding to the maximum extent, due to the existence of a preemptive right of first refusal in favor of Pool and other area residents, regardless of what prices were bid by out-of-state participants. Nor could the Second Resolution be said completely to "supercede" the First Resolution and therefore to eliminate the procedural irregularities of the First Auction. To the contrary, the Second Resolution expressly relied on and incorporated the improper low bids from the First Auction, barred by the First Resolution, in setting the Revised Minimum Bids. Thus, the Second Auction assumed the taint of the improprieties in the First Auction.

22. Schade had purchased four other parcels at the First Auction. Merrell had submitted a high written offer for B-17 after the First Auction. Therefore, KGB clearly knew that they would both be good prospective bidders for the Second Auction. Nevertheless, KGB again gave neither Schade nor Merrell notice that a Second Auction had been scheduled. As before, Schade and Merrell had to find out about it piecemeal, through their own initiative and efforts, again making them wonder if their participation was welcome. Not until the day before the Second Auction did either man hear about possible rights of first refusal in favor of certain bidders.

23. Schade, having already traveled to Ketchikan, expressed his objection to the Borough Property Manager about this procedure but decided to go ahead and participate personally because of his strong interest in the parcel. Merrell, who was also

interested, chose not to attend but decided to participate by having a representative place his bid for him.

24. They each chose to make a bid for B-17—Schade ($815,000) and Merrell ($810,000)—both well above the Revised Minimum Bid but well below the $946,390 Merrell had already offered in writing before the Second Auction. Pool submitted no new bid. However, both Schade's and Merrell's bids at the Second Auction were more than $200,000 above Pool's unauthorized bid from the First Auction. Their bids were the highest and second highest, respectively, received in the Second Auction. Both would have been motivated to bid even higher if they had been competing in a free and fair public auction. Moreover, the area residents, including Pool, who made the original bids, had no incentive whatsoever to bid competitively in the Second Auction, as they would have been bidding against themselves. As expected, they placed no new bids. Therefore, the real losers in this improper scheme were not just the out-of-state bidders, such as Schade and Merrell, but also virtually all the citizens of KGB. The only KGB residents who benefited were the bidders in question, including Pool, who profited by this wrongful procedure.

25. The plain intent was to make sure Pool got B-17, no matter what. Suspicions about the fairness of the process had been further heightened the night before by a public statement made by one of the Assembly members at the Assembly meeting, which was televised locally, referring to those coming from out of town for the bidding as "carpetbaggers."

26. KGB later notified the participants that Pool had exercised his right of first refusal on the highest bid and that the property would be sold to him. Merrell, now knowing that the highest bid had been made by a gentleman named Schade and that his own bid was the second-highest, contacted Schade for the first time to discuss whether there was any remedy for them.

27. Efforts by Schade and Merrell to resolve the matter with KGB without litigation were ignored or rejected.

28. The following counts are alleged in the alternative.

BAXTER BRUCE & SULLIVAN P.C.
P.O. Box 32819, Juneau Alaska 99803
Ph: (907) 789-3166
Fax: (907) 789-1913

BAXTER BRUCE & SULLIVAN P.C.
P.O. Box 32819, Juneau, Alaska 99803
Ph: (907) 789-3166
Fax: (907) 789-1913

## Count I (First Claim for Declaratory Relief—Arbitrary and Capricious Conduct/Abuse of Discretion)

29. Plaintiffs hereby reassert the allegations of paragraphs 1-28 of the Complaint.

30. Schade and Merrell are entitled to a declaratory judgment that KGB acted in an arbitrary and capricious manner with respect to the sale, abusing its discretion. Alaska state law requires a municipal governing body to establish by ordinance a formal procedure for sale of its land. *See* AS 29.35.090. However, KGB does not have an ordinance that establishes such a procedure, but instead does so by Resolution. *See* Section 48.18.010 of the KGB Code of Ordinances.

31. KGB ignored, or failed to follow, its own established procedure set forth in the First Resolution.

32. KGB improperly received bids at the First Auction in amounts less than what was authorized by the First Resolution.

33. KGB then compounded that improper procedure by adopting those unauthorized bid amounts as the Revised Minimum Bids in the Second Resolution for the Second Auction.

34. KGB even further burdened this improper procedure by granting the persons who placed those unauthorized bids a right of first refusal in the Second Auction. By doing so, they attempted in the Second Auction to give preference to local resident bidders v. out-of-state resident bidders in the bidding process.

35. This, coupled with adopting the invalid bids from the First Auction into the Second Resolution, tainted the Second Resolution and rendered it invalid because of these improprieties and because of Resolution's discriminatory intent and impact.

36. By adopting sub-market values, based upon unauthorized, below-minimum bids made at a prior auction by certain local citizens, and then further chilling the bidding at any new auction by granting those very people rights of first refusal in a supposedly free, competitive public process, KGB thereby unlawfully delegated or abdicated to those same local private citizens its governmental duty and power to determine the "best interest" of KGB. As a result, even though both Schade and Merrell far out-bid Pool, they were not given a fair opportunity to have their bids considered by KGB for a

"best interest" determination, because the acceptance or non-acceptance of their bids was left totally in the hands of Pool. All he had to do was either to exercise or not to exercise the right of first refusal granted to him.

37. KGB further failed to provide proper and timely notice to Schade and Merrell of both the First and Second Auctions and the rules governing them.

38. KGB further acted improperly by advertising the Second Auction as an open bid public auction when in fact it was not. It was, in effect, a limited or private auction where certain participants were given a huge advantage without even being required to bid. Assuming it were permissible to discriminate in this fashion (which is denied), KGB should plainly have stated its intent to give preference to local residents over those out-of-state, regardless of bid amount.

39. When considered with the additional fact that KGB flatly ignored Merrell's written offer following the First Auction, which exceeded Pool's unauthorized bid from the First Auction by nearly $350,000, KGB's discriminatory intent becomes even plainer.

40. There was therefore no rational basis to conclude that the Second Auction, which incorporated the defects of the First Auction, was in the best interest of the borough. A "best interest" determination is required by Section 48.18.010 of the KGB Code of Ordinances but was not validly made.

41. Each of the forgoing acts was arbitrary and capricious, was an abuse of discretion, and was a sufficient basis for invalidating the resolution and the sale. As such, Schade and Merrell are entitled to a judgment against KGB (a) declaring that that the offending portions of the Second Resolution, namely the Revised Minimum Bids and the rights of first refusal, are improper and invalid, setting aside any sale of B-17 to Pool, and directing conveyance of the property to Schade as the high bidder; or, alternatively, (b) declaring the entire Second Resolution and therefore the Second Auction to be improper and invalid, including any attempted sale or transfer to Pool, and declaring that B-17 should be re-scheduled for public auction to the highest bidder, without preference to any bidder or group of bidders.

**Count II  (Second Claim for Declaratory Relief--Estoppel Against KGB)**

42. Plaintiffs hereby reassert the allegations of paragraphs 1-41 of the Complaint.

BAXTER BRUCE & SULLIVAN P.C.
P.O. Box 32819, Juneau Alaska 99803
Ph: (907) 789-3166
Fax: (907) 789-1913

43. KGB is estopped from proceeding with the sale to Pool. By its conduct, KGB asserted that the First Auction would be conducted under the written rules set out in the bid documents provided to prospective bidders. Those written rules established minimum bids. Schade and Merrell were entitled to and did rely on the written rules. They were later prejudiced when unauthorized bids, not accepted in the First Auction, were brought over and used as the minimum bids in the Second Auction, accompanied by rights of first refusal to those who had made the unauthorized bids. Had they been properly notified of this intent at the First Auction, both Schade and Merrell would at least have had a chance to bid higher than Pool on B-17, in order to avoid being disadvantaged in any future auction. They were both ready, willing, and able to make such a commitment, as the facts plainly demonstrate, and would have chosen to do so. However, they were denied the opportunity by KGB's failure to properly and timely notify the participating bidders of these facts.

44. Notwithstanding these improper preferences, both Schade and Merrell bid higher than Pool in the Second Auction.

45. Therefore, Plaintiffs are entitled to a declaration that (a) KGB is estopped to convey the property to Pool and (b) the property should be either conveyed to Schade as the high bidder or posted for a new and fair sale conducted without preference to any bidder or group of bidders.

### Count III (Third Claim for Declaratory Relief—Denial of Equal Protection)

46. Plaintiffs hereby reassert the allegations of paragraphs 1-45 of the Complaint.

47. KGB attempted in the Second Resolution to draw a distinction between local bidders and out-of-state-bidders, such as Schade and Merrell.

48. Although that distinction did not appear on the face of the Second Resolution, there was clearly a discriminatory impact from the application of the Second Resolution. That discriminatory impact was bought about by the discriminatory intent or purpose of the resolution—to favor Pool and perhaps other local resident bidders over out-of-state resident bidders in a sale otherwise advertised as an open bid auction.

49. Under the "rational basis" test enunciated by the United States Supreme Court, there is no rational relationship between this municipal enactment and a legitimate government

BAXTER BRUCE & SULLIVAN P.C.
P.O. Box 32819, Juneau Alaska 99803
Ph: (907) 789-3166
Fax: (907) 789-1913

purpose. The only legitimate purpose would have been to receive the highest possible amount from the sale of B-17 for the benefit of the borough. This procedure discouraged maximum bidding both by the out-of-state participants and by the holders of the right of first refusal. Even its own ordinance required KGB to act in the "best interest" of the borough. This it did not do. Consequently no legitimate governmental purpose was served by providing this right of first refusal to a select few.

50. The Second Resolution, including its application by KGB, therefore violates the Fourteenth Amendment to the United States Constitution by denying out-of-state bidders, such as Schade and Merrell, equal protection with in-state or local bidders, such as Pool. U.S. Const. Amend. XIV.

51. As such, Schade and Merrell are entitled to a judgment against KGB (a) declaring that that the offending portions of the Second Resolution, namely the Revised Minimum Bids and the rights of first refusal, are improper and invalid, setting aside any sale of B-17 to Pool, and directing conveyance of the property to Schade as the high bidder; or, alternatively, (b) declaring the entire Second Resolution and therefore the Second Auction to be improper and invalid, including any attempted sale or transfer to Pool, and declaring that B-17 should be re-scheduled for public auction to the highest bidder, without preference to any bidder or group of bidders.

### Count IV (Provisional and Permanent Injunctive Relief)

52. Schade and Merrell reassert paragraphs 1-51 of the Complaint.

53. The Second Resolution and any attempted sale are improper and invalid because the conduct of KGB, as alleged in Count I, was arbitrary and capricious. Alternatively, as alleged in Count II, KGB is estopped to convey the property to Pool. In the further alternative, as alleged in Count III, the Second Resolution is unlawful because its discriminatory intent or purpose together with its discriminatory impact results in a denial of equal protection of the laws, thereby invalidating the resolution and the sale. Each parcel of real estate is unique and both Schade and Merrell will suffer irreparable harm if the sale is allowed to be consummated by delivering title to Pool.

54. Moreover, Schade and Merrell have raised, as set forth above, serious and substantial questions going to the merits of this case. Alternatively, Schade and Merrell can and

will show probable success on the merits.  Immediate injunctive relief is necessary. KGB has either ignored or rejected the repeated request that the sale be set aside. Although counsel for KGB advised that the transfer would not likely occur until after the first of the year, at Mr. Pool's request, he could not give assurance that it might not take place earlier.  Schade and Merrell therefore request and are entitled to immediate temporary injunctive relief against KGB and Pool to prevent the transfer from taking place until an evidentiary hearing can be held and preliminary injunctive relief can be awarded pending trial on the merits, followed by permanent injunctive relief, if still necessary, at the time Plaintiffs prevail on the merits.

### **Request for Relief**

55. Schade and Merrell request the following relief:

    a.   Immediate injunctive relief against transfer of the property to Pool, followed by preliminary injunctive relief pending trial on the merits, and if still necessary, by permanent injunctive relief at the time Schade and Merrell prevail at a trial on the merits;

    b.   An order declaring the offending portions of the Second Resolution invalid, setting aside any attempted sale to Pool, and declaring that B-17 should be conveyed to Schade as the high bidder;

    c.   Alternatively, an order declaring the Second Resolution invalid in its entirety, annulling the Second Auction,  setting aside any attempted sale  to Pool, and declaring that B-17 should be re-scheduled for public auction to the highest bidder, without preference to any bidder or group of bidders;

    d.   An order declaring that Schade and Merrell be awarded attorneys' fees pursuant to Rule 82 of the Alaska Rules of Civil Procedure, which has been determined to be a substantive rule not in conflict with federal law, and therefore is applicable here;

    e.   Recovery of costs of court; and

BAXTER BRUCE & SULLIVAN P.C.
P.O. Box 32819, Juneau Alaska 99803
Ph: (907) 789-3166
Fax: (907) 789-1913

1

2        f.    Such further or modified relief as may be appropriate under the circumstances.

3

4        DATED this 28th day of December, 2005.

5

6

7                                              BAXTER BRUCE & SULLIVAN P.C.

8

9                                              By _____

10                                                  Richard L. Nelson, ABA No. 0209036
                                                    Attorneys for Plaintiffs
11

12

13  **CERTIFICATE OF SERVICE**

14  I hereby certify that on this 28th day of
    December, 2005, I served a copy of the
15  foregoing by either fax or by email on: (1)
    counsel for Defendant Ketchikan Gateway
16  Borough, Mr. Mitchell A. Seaver, 344
    Front Street, Ketchikan, Alaska 99901;
17  and (2) counsel for Charles Pool,
    Geoffrey Currall, Keenan & Currall P.C.,
18  540 Water St. Suite 302, Ketchikan
    99901.
19

20

21  _____
    Heather A. Hildebrand
22

23

24

25

26

27

28

29

30

BAXTER BRUCE & SULLIVAN P.C.
P.O. Box 32819, Juneau Alaska 99803
Ph: (907) 789-3166
Fax: (907) 789-1913

*Joergen Schade and Robert Merrell v. Ketchikan Gateway Borough and Charles Pool*
**First Amended Complaint; Page 13 of 13; Case No. J05-0017 CV (JKS)**