Richard L. Nelson
ABA No. 0209036
Baxter Bruce & Sullivan, P.C.
P.O. Box 32819
Juneau, Alaska 99803
phone: (907) 789-3166
fax: (907) 789-1913
rnelson@baxterbrucelaw.com
Attorneys for Plaintiffs

**FILED**

DEC 2 8 2005

UNITED STATES DISTRICT COURT
DISTRICT OF ALASKA
By_____ Deputy

IN THE UNITED STATES DISTRICT COURT
FOR THE STATE OF ALASKA

JOERGEN SCHADE and ROBERT )
MERRELL )
 )
          Plaintiffs, )
 )
vs. )
 )
KETCHIKAN GATEWAY BOROUGH and )
CHARLES POOL )
 )
          Defendants )   Case No. J05 - 017 CV (JKS)
_____)

**NOTICE OF FILING ORIGINAL SIGNATURES**

Plaintiffs give notice of filing the original signature pages to the Affidavits of Joergen Schade and Robert Merrell, facsimiles of which were attached to the plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction.

DATED this 27th day of December, 2005.

BAXTER BRUCE & SULLIVAN P.C.

By _____
Richard L. Nelson, ABA No. 0209036
Attorneys for Plaintiffs

**CERTIFICATE OF SERVICE**
I hereby certify that on this 27th day of December, 2005, I served a copy of the foregoing by either fax or by email (attachment as scanned document) on: (1) Mr. Mitchell A. Seaver, 344 Front Street, Ketchikan, Alaska 99901; and (2) Geoffrey Currall, Keenan & Currall P.C., 540 Water St. Suite 302, Ketchikan 99901.

_____
Heather A. Hildebrand

*Joergen Schade and Robert Merrell v. Ketchikan Gateway Borough and Charles Pool*
*Notice of Filing Original Signatures; Page 1 of 1; Case No. J05-017 CV (JKS)*

IN THE UNITED STATES DISTRICT COURT
FOR THE STATE OF ALASKA

JOERGEN SCHADE and ROBERT )
MERRELL, )
 )
      Plaintiffs, )
 )
vs. )
 )
KETCHIKAN GATEWAY BOROUGH and )
CHARLES POOL, )
 )
      Defendants. )  Case No. J05 - _____ CV (___)
_____)

## AFFIDAVIT OF JOERGEN SCHADE

Joergen Schade, after being first duly sworn upon oath, deposes and states:

1. I am more than 19 years of age and make this affidavit based upon personal knowledge, except where otherwise indicated.

2. The facts stated herein are true and correct.

3. I am a resident of Mercer Island, Washington.

4. I participated as a bidder in two auctions of certain parcels of real estate by Ketchikan Gateway Borough ("KGB") in the East Ward Cove, Mud Bay, and Carroll Inlet Areas conducted in August and September of this year.

5. Although I did not have, at the time, copies of the resolutions authorizing the two procedures, I later learned that the auctions were conducted under Resolution 1881 by the Ketchikan Gateway Borough Assembly, dated March 21, 2005 (the "First Resolution") and Resolution 1906 Amended, dated September 6, 2005 (the "Second Resolution"). True copies of the First Resolution and the Second Resolution are attached as Exhibits "A" and "B," respectively.

6. I first expressed an interest in purchasing properties owned by KGB in these areas in the first quarter of 2005. The Borough Manager, Roy Eckert, acknowledged that I

BAXTER BRUCE & SULLIVAN P.C.
P.O. Box 32819, Juneau Alaska 99803
Ph: (907) 789-3166
Fax: (907) 789-1913

*Joergen Schade and Robert Merrell v. Ketchikan Gateway Borough and Charles Pool*
Affidavit of Joergen Schade; Page 1 of 6; Case No. J05-_____ CV (___)

was one of the first people to do so. He indicated KGB might consider placing these waterfront properties up for auction by sealed bids. I told him I was not interested in participating in that sort of auction and encouraged KGB to handle it by public outcry auction because it gave the public process the transparency it should have.

7. Having expressed an interest from a very early stage, I assumed I would be given notice as a prospective bidder on any sale or auction that was scheduled for these properties by KGB. I was wrong. I was not provided notice, but only found out through calling back to inquire if KGB planned to conduct any auction. I began to wonder if my participation, as a non-resident of Alaska, or of Ketchikan in particular, was welcome.

8. Through my own inquiries, I learned that certain properties in these areas had in fact been scheduled for public outcry auction (the "First Auction"). I requested and received a copy of the bid documents identifying the parcels up for sale and setting out the rules of the auction, including the minimum bids. When I learned the date of the auction, I scheduled a trip to Ketchikan to participate.

9. At the First Auction, conducted on August 4, 2005, I bid on and purchased four parcels for a total price exceeding $1 million. There were four other parcels, including B-17, on which no bids were at first received. The persons conducting the sale then huddled quickly and announced that bids below the minimums set by the rules would be received on these remaining parcels.

10. Although I was interested in parcel B-17, I chose not to bid because the ad hoc process seemed questionable to me when the written rules of the auction did not allow submitting lower bids. I also held back because I wanted to see if anyone would place a bid at least close to the minimum bids before deciding whether I should join in. No one did. The highest bid was $600,000 by a man named Charles Pool ("Pool"), slightly more than half the minimum bid of $1,090,700 required by the written rules for that property. I did not know Mr. Pool. Because his bid was so

*Joergen Schade and Robert Merrell v. Ketchikan Gateway Borough and Charles Pool*
Affidavit of Joergen Schade; Page 2 of 6; Case No. J05-_____ CV (___)

far below the minimum bid, I did not think that it would be accepted and chose not to place a bid for myself.

11. Pool's bid was not accepted and the property was not sold. I assumed that if the property were scheduled for a new auction, I would have the same fair chance at purchasing as all other prospective buyers.

12. Having purchased four other properties in the First Auction, I again assumed KGB would notify me if the remaining four parcels were to be auctioned. Again, I was wrong. I received no notification from KGB. I found out by my own inquiries that these properties would be sold though an open bid process closing on September 20, 2005 (the "Second Auction"). I obtained a copy of the bid documents. Nothing was said about favoring any class of bidders or granting rights of first refusal to certain bidders.

13. Not until I made the trip to Ketchikan on September 19, 2005, to be present for the final day of the Second Auction, did I hear for the first time that some participants would be given a big advantage—i.e., those who had had the high bids (but still well below the minimums set by the written rules) at the ad hoc round in the First Auction would be given a right of first refusal. This did not seem at all fair to me, and when I arrived in Ketchikan, I made my objection known the Borough Property Manager. However, I decided to participate anyway because I was really interested in purchasing B-17. I felt it would enhance the parcels I had already purchased.

14. However, that evening, I was watching the Assembly meeting on local public television as the Second Auction was being discussed. One of the Assembly members referred to those coming from out of town for the bidding as "carpetbaggers." The gentleman who made the comment was sitting on the right side, wearing a green shirt, as I recall. I remember being stunned not only at the biased attitude but also that the statement was being made in a public forum.

15. The next day, I did not bid as high as I would have if I had been bidding in a free

*Joergen Schade and Robert Merrell v. Ketchikan Gateway Borough and Charles Pool*
Affidavit of Joergen Schade; Page 3 of 6; Case No. J05-_____ CV (___)

and even bidding process. It was very discouraging to know that even if I was high bidder, I could be "trumped" by someone who was not even required to submit a new bid at the auction. I could not understand how KGB could consider this process to be either fair or in its best interest. Participants like me who did not hold rights of first refusal were not the only ones who were discouraged from bidding as high as they otherwise would in an even competition. The holders of the rights of first refusal themselves had no incentive to bid any amount whatsoever above their previous offers because they would be bidding against themselves. It made no sense to me. It did not seem like a real auction at all.

16. On September 20, 2005, I watched as the bids were placed up on a chalkboard. As the bidding was drawing to a close, I saw that the high bid was $810,000 by a gentleman named Merrell. Mr. Merrell was not present personally but presented his bid through another. I did not know Mr. Merrell or the person who placed the bid for him. Shortly before the bidding closed, I place my bid of $815,000. I do not recall Mr. Pool making any bid. No further bids were received and my bid was the highest. After the auction was over, I returned home to Washington.

17. The next thing I heard about the sale was from Mr. Merrell. Before receiving his call, I had never met or communicated with him. He told me he was the one who placed the second-highest bid and had learned I was the high bidder in the auction, at $815,000. He said he had also learned that Mr. Pool had chosen to exercise his right of first refusal and that KGB planned to convey B-17 to him. We found out that Mr. Pool was apparently a local resident. As I was unaware of any other non-resident bidders in the auction than myself and Mr. Merrell, I assumed all the other bidders besides Mr. Pool who held rights of first refusal were local as well. I also learned that Pool, through his local engineering firm, apparently had close business and/or social ties with the Assembly members. Mr. Merrell's information about KGB's intention to convey to Pool was confirmed by a letter I received from the Acting

*Joergen Schade and Robert Merrell v. Ketchikan Gateway Borough and Charles Pool*
Affidavit of Joergen Schade; Page 4 of 6; Case No. J05-_____ CV (___)

Borough Manager, Steve Corporon, dated September 27, 2005, a true copy of which is attached as Exhibit "C."

18. After discussing the matter further with him, we decided to contact counsel because we did not feel the intended conveyance to Mr. Pool was proper. Mr. Merrell told me he did not object to the property going to me because I had been the high bidder. We were both also amenable to having KGB reschedule and re-conduct the auction with even rules for all bidders. That way, Mr. Pool would not be disadvantaged by not having made a new bid in the Second Auction. He could choose to bid on the same terms as everyone else.

19. Through counsel, we repeatedly contacted KGB to try to resolve the matter without litigation. True copies of our counsel's letters to KGB dated September 30, 2005, and October 3, 2005, are attached as Exhibits "D" and "E," respectively. KGB rejected our efforts. We received a reply from Mr. Corporon by letter dated October 6, 2005, indicating the sale to Mr. Pool would go forward unless the Assembly directed otherwise. A true copy of Mr. Corporon's letter is attached as Exhibit "E." We responded through our counsel's letter of October 14, 2005, a true copy of which is attached as Exhibit "F," to which no formal reply was received. After further inquiry, we learned that KGB's counsel indicated the property would probably not be conveyed until after the first of the year at Mr. Pool's request for tax reasons, but that counsel's information might not be 100% reliable. A true copy of that email, dated November 18, 2005, is attached as Exhibit "G." In one last effort to avoid litigation, I authorized counsel to contact KGB one more time. A true copy of counsel's letter, dated December 7, 2005 is attached as Exhibit "H." Except for the possibly mistaken reference to a "sealed bid process," (the bids were actually published in the fashion I describe in this affidavit) the letter accurately reflects our position at the time. To my knowledge, no reply has been received.

20. I consider the treatment that Mr. Merrell and I received from KGB to be grossly

*Joergen Schade and Robert Merrell v. Ketchikan Gateway Borough and Charles Pool*
Affidavit of Joergen Schade; Page 5 of 6; Case No. J05-_____ CV (___)

unfair and discriminatory in relation to its own resident bidders like Mr. Pool. I do not feel that damages can adequately compensate me for the wrong. As I consider each separate parcel of real estate to be unique, I cannot replace this lost opportunity through damages or another substituted parcel. I will be irreparably harmed if this unfair process is allowed to stand, allowing the property to be conveyed to Mr. Pool.

DATED this 20 day of December, 2005.

Joergen Schade

SUBSCRIBED and SWORN TO before me this 20 day of December, 2005.

Notary Public, State of Washington
My commission expires:



BAXTER BRUCE & SULLIVAN P.C.
P.O. Box 32819, Juneau Alaska 99803
Ph: (907) 789-3166
Fax: (907) 789-1913

*Joergen Schade and Robert Merrell v. Ketchikan Gateway Borough and Charles Pool*
Affidavit of Joergen Schade; Page 6 of 6; Case No. J05-_____ CV (___)

IN THE UNITED STATES DISTRICT COURT
FOR THE STATE OF ALASKA

JOERGEN SCHADE and ROBERT MERRELL )
)
Plaintiffs, )
)
vs. )
)
KETCHIKAN GATEWAY BOROUGH and )
CHARLES POOL )
)
Defendants )  Case No. J05 - _____ CV (___)

## AFFIDAVIT OF ROBERT MERRELL

Robert Merrell, after being first duly sworn upon oath, deposes and states:

1. I am more than 19 years of age and make this affidavit based upon personal knowledge, except where otherwise indicated.

2. The facts stated herein are true and correct.

3. I am a resident of Seattle, Washington.

4. I am familiar with two auctions for the sale of certain parcels of real estate by Ketchikan Gateway Borough ("KGB") in the Ward Cove, Mud Bay, and Carroll Inlet Areas conducted in August and September of this year.

5. I found out about the schedule for both auctions on my own. I was not notified of the schedule for either auction by KGB. Although I chose not to participate in the first auction held on August 4, 2005 due to the minimum bids that were required, I learned that some of the parcels were not sold at the auction. I therefore made written offers on behalf of my property management and real estate business, Mariner Properties, LLC ("Mariner"), by letter dated August 10, 2005, on several properties, including the parcel designated by KGB as B-17, after that auction. A true copy of that letter is attached as Exhibit "A." The offer on B-17 was for $934,830. The letter was accompanied by a non-refundable $50,000 deposit. A

*Joergen Schade and Robert Merrell v. Ketchikan Gateway Borough and Charles Pool*

further letter of explanation was sent to the Borough Manager, dated August 12, 2005. A true copy of that letter is attached as Exhibit "B."

6. KGB essentially ignored the offer on B-17. The proposal for B-17 was not contingent upon acceptance of my offer on any other parcel. KGB's only response was to return the deposit check without comment or explanation as to the offer on B-17. A true and correct copy of KGB's letter of August 17, 2005, returning the check is attached as Exhibit "C."

7. At the very least, however, I thought my serious expression of interest, as reflected by these offers, would mean that I would be notified of any further auction involving B-17. I was not. This surprised me and made me curious as to whether there was a feeling at KGB that bids from outsiders (i.e., non-residents) were resented. I later found out through my own inquiries that B-17 would be offered for sale by public open-bid auction closing on September 20, 2005, (the "Second Auction").

8. I requested and received on August 26, 2005, the bid documents. The bid documents listed the rules of the auction including the minimum bids, but did not say any thing about certain bidders being granted rights of first refusal. In fact, the documents included a place for addenda, with a line for each bidder to initial that he or she had received all addenda to the documents. There were no addenda attached. On September 19, 2005, the day before the Second Auction would close, I contacted KGB to see if there were any addenda and was assured there were none. True and correct copies of the bid documents I received, including the Bidder's Form I signed, are attached collectively as Exhibit "D."

9. Only through rumor did I later learn that rights of first refusal might be granted in this auction to certain unsuccessful bidders from the first auction, even though they had never submitted the minimum bid required by the rules of that auction. I was shocked. This seemed particularly unfair because I had foregone the first auction since I believed at that time that the minimum bids had been set too high by the rules. I decided to go ahead and bid anyway because of my interest in B-17. I submitted my bid, dated September 19, 2005, in the amount of $810,000 through a representative who was present on the final day. I later learned that at the close of

the bidding, the high bid, in the amount of $815,000 had been made by a gentleman named Joergen Schade who also lived in the Seattle area. When I received word that KGB had decided to convey the property to a local resident, Charles Pool, under a right of first refusal, I felt something needed to be done to prevent this injustice. I also learned Mr. Pool is a local resident, unlike Mr. Schade and me. I decided to contact Mr. Schade to see how he viewed the matter.

10. Mr. Schade consulted with counsel. I learned that he tried repeatedly to resolve the matter with KGB, without success. I then joined his ongoing effort to come up with an amicable solution, without resorting to the courts. Our efforts were either rejected or, in some cases, just ignored by KGB.

11. I believe, if B-17 should be conveyed to anyone as a result of the Second Auction, it should be to Joergen Schade as the high bidder. I have told him so. However, I am also amenable to a new auction being held, fair and even to all bidders, for the sale of B-17. Finally, I am still ready, willing, and able to pay the amount I offered in writing by letter of August 10, 2005.

12. Like Mr. Schade, I will be irreparably harmed if this unfair process is allowed to stand and the property is conveyed to Mr. Pool. I feel that I have not been treated equally and fairly with resident bidders like Mr. Pool and that receiving damages from KGB cannot adequately compensate me for such treatment.

DATED this 20 day of December, 2005.

_____
Robert Merrell

SUBSCRIBED and SWORN TO before me this 20TH day of December, 2005.

_____
Notary Public, State of Washington
My commission expires: Jan. 30, 2009

*Joergen Schade and Robert Merrell v. Ketchikan Gateway Borough and Charles Pool*

BAXTER BRUCE & SULLIVAN P.C.
P.O. Box 32819, Juneau Alaska 99803
Ph: (907) 789-3166
Fax: (907) 789-1913