Richard L. Nelson
ABA No. 0209036
Baxter Bruce & Sullivan, P.C.
P.O. Box 32819
Juneau, Alaska  99803
phone:  (907) 789-3166
fax: (907) 789-1913
rnelson@baxterbrucelaw.com
Attorneys for Plaintiffs

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA**

| | |
|---|---|
| JOERGEN SCHADE and ROBERT MERRELL, <br><br>　　　　Plaintiffs, <br><br>vs. <br><br>KETCHIKAN GATEWAY BOROUGH and CHARLES POOL, <br><br>　　　　Defendants | ) ) ) ) ) ) ) ) ) ) ) )  Case No. J05 - 0017 CV (RRB) |

### AMENDED MEMORANDUM IN SUPPORT OF MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

Pursuant to Rule 65 of the Federal Rules of Civil Procedure, Joergen Schade ("Schade") and Robert Merrell ("Merrell") seek immediate temporary injunctive relief against Ketchikan Gateway Borough ("KGB") and Charles Pool ("Pool") to prevent the wrongful conveyance to Pool by KGB of Parcel B-17 from taking place until an evidentiary hearing can be held and preliminary injunctive relief can be considered pending trial on the merits. The parcel was put up for public open-bid auction by KGB. Pool was not the high bidder on the parcel. Schade and Merrell placed the highest and second highest bids, respectively, but KGB intends nevertheless to convey the property to Pool, who was given an illegal preference.

**Facts**

The facts are summarized in the Complaint and Affidavits of Schade and Merrell. They will not be repeated here. The abbreviations used herein are the same as those in the Complaint.

**Argument**

**A.   Standards for Granting a Temporary Restraining Order and a Preliminary Injunction**

Under Federal Rule of Civil Procedure 65, a plaintiff may obtain preliminary injunctive relief upon establishing either: (1) probable success on the merits and irreparable harm if relief is denied, or (2) that there are serious questions on the merits and the balance of hardship tips sharply in favor of plaintiff. Rent-A-Center, Inc. v. Canyon Television and Appliance Rental, Inc., 944 F.2d 597, 602 (9th Cir.1991). The higher a plaintiff's probability of success, the less the "balance of hardship" consideration need tip in plaintiff's favor to support issuance of an injunction. State of Alaska v. Native Village of Venetie, 856 F.2d 1384, 1389 (9th Cir.1988).

Alaska state standards for injunctive relief are similar. Under A.J. Industries, Inc. v. Alaska Public Service Commission, 470 P.2d 537 (Alaska 1970), a party may obtain preliminary relief if the following requirements are satisfied:

1. The plaintiff must be faced with irreparable harm;
2. The opposing party must be adequately protected; and
3. The plaintiff must raise serious and substantial questions going to the merits of the case; that is, the issues raised cannot be "frivolous or obviously without merit."

A.J. Industries, 470 P.2d at 540. *See also,* Alaska Public Utilities Commission v. Greater Anchorage Area Borough, 534 P.2d 549, 554 (Alaska 1975); Messerli v. Department of Natural Resources, 768 P.2d 1112, 1122 (Alaska 1989). It is not necessary for a party to establish a clear probability of success on the merits in order to obtain preliminary injunctive relief. A showing of probable success on the merits is required only if the movant does not face irreparable harm or the opposing party cannot be adequately protected. State v. Cook Inlet Drift Association, 815 P.2d 378, 378-379 (Alaska 1991).[1]

---

[1] The Alaska Supreme Court reaffirmed these standards for issuance of preliminary injunctions in North Kenai Peninsula Road Maintenance Service Area v. Kenai Peninsula Borough, 850 P.2d 636, 639 (Alaska 1993):

BAXTER BRUCE & SULLIVAN P.C.
P.O. Box 32819, Juneau Alaska 99803
Ph: (907) 789-3166
Fax: (907) 789-1913

In determining whether to grant a motion for temporary restraining order or preliminary injunction, the court must "balance the hardships and equities." A.J. Industries, 470 P.2d at 540; Greater Anchorage Borough, 534 P.2d at 554 (Alaska 1982). The court must look to such factors as: (1) the movant's state of mind; (2) the relative hardship to the parties if the injunctive relief is or is not granted; (3) the conduct of the movant; and (4) the interests of the public and of third persons. Ostrem v. Alyeska Pipeline Service Co., 648 P.2d 986, 989 (Alaska 1982).

This is clearly a case for injunctive relief. Merrell and Schade will suffer irreparable harm if the sale to Pool is allowed to be consummated. The Courts have long recognized that real estate by its nature is unique and that damages cannot adequately compensate for the loss of it or the right to own it. In view of the factual issues raised above, individually and collectively, a temporary restraining order should be granted until a full evidentiary hearing can be held for purposes of determining whether a preliminary injunction should be entered pending a trial on the merits.

These issues are clearly substantial and serious, going to the merits of (a) the validity of the Second Resolution (including the improper right of first refusal granted thereunder to Pool on the basis of his illegal bid at the First Auction), (b) the validity of the Second Auction conducted under the Second Resolution, and (c) the validity of intended conveyance to Pool resulting from his attempted exercise of the right of first refusal. In terms of balancing the equities and hardships, including the interests of both sides and the public, the court can see that the relief requested does not deprive Mr. Pool of the property—it only briefly holds the sale in abeyance until the court can examine the issues. Pool's interest can be adequately protected by an appropriate bond. The public's interest is protected because no other properties are affected at the preliminary injunction stage, KGB is in possession of Pool's deposit and, if plaintiffs' allegations are ultimately proven, the citizens of KGB will benefit from free and fair competitive bidding designed to maximize the proceeds from the new

---

> We apply to preliminary injunctions a "balance of hardships" approach which entails a three-part test: 1) the plaintiff must be faced with irreparable harm; 2) the opposing party must be adequately protected; and 3) the plaintiff must raise serious and substantial questions going to the merits of the case; that is, the issues cannot be "frivolous or obviously without merit." [cites omitted]  The "serious and substantial question" standard applies only where the injury which will result from the preliminary injunction is relatively slight in comparison to the injury which the person seeking the injunction will suffer if the injunction is not granted.  [cites omitted]

auction of the property. At least one of the plaintiffs, Merrell, has already demonstrated a willingness to bid much higher than the amount for which KGB is now attempting to sell to Pool.

If the allegations are not proven, neither Pool nor the public will have been significantly harmed by the brief delay in reaching a preliminary injunction determination. By rule, that determination must occur within 10 days of the granting of the temporary restraining order, unless otherwise agreed. F.R.C.P. 65. Moreover, from the factual issues raised, the probable success on the merits, though not a requirement under these circumstances can easily be surmised. By contrast, if the sale is not restrained, the harm to Schade and Merrell will be irreparable.

### B. State Law Claim—Abuse of Discretion/KGB's Arbitrary and Capricious Conduct

Discretionary actions that do not require formal procedures are reviewed under the "arbitrary and capricious" or abuse of discretion standard. Olson v. State of Alaska, 799 P.2d 289 (Alaska 1990). In the case of a borough, such as KGB, Alaska law requires that the governing body establish by ordinance a formal procedure for acquisition and disposal of land and interest in land by the municipality. AS 29.35.090. KGB does not have an ordinance which establishes a formal procedure, but chooses to do so by resolution. Section 40.18.010 (a) of the KGB Code of Ordinances provides that the sale of real property by KGB may be made "...when and upon such terms and conditions as the assembly, in its sole discretion, determines by resolution to be in the best interest of the borough." However, as the cases make clear, this broad discretionary language cannot be used as a shield to avoid scrutiny of its decisions under an arbitrary and capricious standard to sell real property. Otherwise, any abuse of discretion committed by KGB in such a process could be said to be legislatively condoned, in bootstrap fashion, by KGB itself. And, despite the discretionary language, the ordinance does impose upon KGB a duty to make a "best interest" determination. See § 40.18.010 (a). Plaintiffs are aware of no such valid determination in this case. Even if such a determination had been made, it could not withstand even minimum scrutiny under these circumstances, fraught with procedural and substantive irregularities, favoritism, manipulation, and patent unfairness.

BAXTER BRUCE & SULLIVAN P.C.
P.O. Box 32819, Juneau Alaska 99803
Ph: (907) 789-3166
Fax: (907) 789-1913

*Joergen Schade and Robert Merrell v. Ketchikan Gateway Borough and Charles Pool*
**Amended Memorandum in Support of Injunctive Relief; Page 4 of 13; Case No. J05-0017 CV (RRB)**

However, to understand how KGB could have determined its own "best interest," one need look no further than the recitals in the First Resolution and Second Resolution. The First Resolution recited its reasons for selling:

> WHEREAS, the Ketchikan Gateway Borough desires to get these parcels on the tax rolls; and
> WHEREAS, having these parcels in private v. government hands encourages the economic growth of some businesses, start of new businesses into the community and an overall increase in year round jobs positively affecting economic growth and stability serves the Ketchikan Gateway Borough's economic development interests; and
> WHEREAS, the East Ward Cove, Mud Bight [sic] and Carroll Inlet parcels are not required for current Borough purposes...

There was no recital or suggestion in the Resolution that selling to a local resident was preferable to selling to an out-of-state bidder which exceeded the local bidder's offer by anywhere from $215,000 to nearly $350,000. That would be ludicrous. Clearly, the tax revenue can only suffer from KGB's tacit acknowledgement of the lesser amount as the proper tax value. Nor was there any legitimate condition requiring examination of, or any inquiry made concerning, the businesses intended for the parcels. Had there been, the businesses run by Schade, i.e., Nordic Tug Charters and by Merrell, i.e., Mariner Properties, LLC, would have met any legitimate test. Under the circumstances, there was no reason therefore to reject bids by Schade and Merrell which so far exceeded the local bidder's amount. There was absolutely nothing to suggest that the local economy would somehow have fared worse under the ownership of either Schade or Merrell, or their businesses, than under Pool, or his business.

Thus, the absence of any documented determination of "best interest" is clearly suspect. Although land sales by the Department of Natural Resources for the State of Alaska ("DNR") are governed by statute, AS 38.05.035, some of its provisions are at least instructive by analogy. For example, like a municipality, DNR's decisions to sell land are governed under the discretionary or arbitrary and capricious standard. However, unlike the municipality, DNR is authorized under certain conditions to grant a preference in its sales of public lands. For example, DNR may:

> Grant preference rights for the lease or purchase of state land without competitive bid *in order to correct errors or omissions of a state or federal administrative agency when inequitable detriment would otherwise result to a diligent claimant or applicant due to situations over which the applicant had no control...*

AS 38.05.035 (b)(2).

However, DNR, in the exercise of its adjudicative powers, must document its decision with written findings. Messerli v. Department of Natural Resources, State of Alaska, 768 P.2d 1112 (Alaska 1989); Johns v. Commercial Fisheries Entry Commission, 758 P2d. 1256, 1260 (Alaska 1968). Here, no statute or ordinance permits granting of preferences by KGB, especially those eliminating or chilling competitive bidding, under any circumstances. Nor was there any decisional document with written findings of "best interest," supporting the granting of a right of first refusal under these circumstances. Moreover, even if the discretionary language in the KGB ordinance could be said to allow the granting of a preference, presumably it must be limited under an abuse of discretion standard at least to situations where the recipient has suffered some detriment because of errors and omissions beyond his control.

In this case, Pool can make no such claim. He knew the Minimum Bid established by the bid documents in the First Auction was $1,090,700. He chose to bid only $600,000, which KGB was not authorized to accept under the rules. The *ad hoc* change approved on the spot by the auctioneers to accept lower bids was never approved by an amended resolution of the assembly, as required by §48.18.005 (a) of the KGB Code of Ordinances. Therefore, it was invalid. Even if it had been properly approved by the assembly, the bid was never accepted by KGB, so Pool cannot claim to have suffered any detriment.

Counsel for KGB, as a defensive matter, suggested in correspondence (*see* Schade Affidavit, Exhibit "F") that the Second Resolution "superceded" the First Resolution so that the Second Auction was a whole new ballgame, unburdened by any irregularities in the First Auction. Not so.

The Second Resolution expressly references those bids (albeit unauthorized) made in the second round of the First Auction, including Pool's bid of $600,000 on B-17, as the exact minimum bids for the Second Auction. Using the identical amounts for the minimum bids is too convenient to be a coincidence—it was intentional. They were not derived from any other source. The Second Resolution in fact recites (a) that the bids on those parcels "were less than the assessed value," (b) that those bids "are not fair market value offers to purchase those 4

parcels" and (c) that "at the Assembly meeting of August 15, 2005, staff was directed to gain fair market value by listing all 4 bids for sale in open bid for a period of 30 days."

Therefore, using the Second Resolution to list, in the face of those recitals, the exact amount of each of those admittedly sub-market value offers as the new minimum bids for the Second Auction is simply indefensible. It becomes even more so, when one factors in KGB's decision to ignore or reject a written proposal submitted by Merrell, only days before the new public bid process was begun, to purchase B-17 for nearly $350,000 more than Pool's bid at the First Auction. *See* Affidavit of Merrell, Exhibits "A" and "B". The failure even to consider the written offer by Merrell when establishing the new minimum bid for B-17 demonstrates the caprice even further. The Alaska Supreme Court, for example, found that the failure of the municipal appraiser to consider prices paid by taxpayers for their lots when determining market value for tax purposes was arbitrary, setting aside the appraisals and ordering new appraisals considering those sales. <u>CH Kelly Trust v. Municipality of Anchorage</u>, 909 P.2d 1381, 1382 (Alaska 1996). KGB's action, however, demonstrates the ultimate caprice when one sees that the Second Resolution nevertheless adopts Pool's number as the new minimum bid and then goes further by granting Pool a right of first refusal at that or any higher amount that might be bid by others. *See* Schade Affidavit, Exhibit "B", the Second Resolution, § 1 B and 1 C. That means that free and fair competitive bidding by any other bidder was decidedly chilled, discouraging his or her making as high an offer as might otherwise be expected, due to the ever-present contingency that the offer could be "trumped," not by a higher offer, but by a preemptive right of first refusal granted to a local resident who was not even required to bid. Other jurisdictions have held that conditions stifling or chilling the bidding at a public auction are legitimate grounds for challenging such sales. *See, e.g.*, <u>Schwartz v. Capital Savings & Loan</u>, 381 N.E.2d 957 (Ohio App. 1978). In <u>Schwartz</u>, the court, explaining its reasons for reversing the lower court's dismissal of the complaint challenging a sale at public auction, noted:

> "Inasmuch as competitive bidding is the essence of an auction sale, such sale must be conducted openly and fairly with full and free opportunity for competition among all prospective bidders. *Conduct or artifice which has as both its purpose and effect to stifle fair competition and chill the bidding is against public policy*." <u>Schwartz</u>, 381 N.E.2d at 959 (*emphasis added*).

*Joergen Schade and Robert Merrell v. Ketchikan Gateway Borough and Charles Pool*
**Amended Memorandum in Support of Injunctive Relief; Page 7 of 13; Case No. J05-0017 CV (RRB)**

*See also* State v. Cate, 371 S.W.2d 541 (Arkansas 1963) (holding that a sale at public auction of a parcel subject to a lease which contained an option to purchase stifled the bidding).

Thus, the only logical explanation for KGB's action is deliberate manipulation behind the scenes to make sure the local favorites held trump cards, while conducting a sale under the guise of a fair and public competitive bid process. Notably, the original Resolution 1906, upon information and belief, provided for a straightforward, even-handed public auction, without unlawful preferences. Schade and Merrell believe that the discussion in the Assembly meeting(s) that led to "Resolution 1906 Amended" which included the Revised Minimum Bids and the nefarious rights of first refusal (*i.e.*, the Second Resolution) may hold clues to the favoritism and manipulation that now seem obvious under the circumstances. Even later Assembly meetings may prove telling. The Assembly member's televised comment, made at the meeting the evening before the Second Auction closed, referring to the out-of-town bidders as "carpetbaggers" certainly suggests an atmosphere of local bias surrounding the bid process. In addition, testimony by Assembly members of private discussions on the subject may shed light on the reasons for the odd change in the resolution.

Certainly, both Schade and Merrell independently experienced an odd reluctance from KGB to provide notice to them of both auctions, even though it was or should have been obvious to KGB that they were both interested and viable prospective bidders for the properties. These factors, considered with the undeniable distinction that Pool is a local resident and neither Schade nor Merrell is, clearly suggest that the Assembly acted arbitrarily and capriciously in passing the Second Resolution.

Cases from other 9th Circuit states are also instructive. In perhaps the closest case on point to our facts, the Supreme Court of Arizona, in Brown v. City of Phoenix, 272 P.2d 358 (Arizona 1954), found that the city council of Phoenix had acted arbitrarily and capriciously in refusing to award a contract to the highest bidder at public auction of an automobile rental lease at the municipal airport. The council awarded the lease at the municipal airport to the existing lease holder, apparently a resident of Arizona, at his bid of 17% of gross monthly rentals, when the owner of a national franchise, who resided in Denver, Colorado (where his principal place of business was located), bid 18% of gross monthly rentals. The court set aside the award. The court found the following factors material:

*Joergen Schade and Robert Merrell v. Ketchikan Gateway Borough and Charles Pool*
**Amended Memorandum in Support of Injunctive Relief; Page 8 of 13; Case No. J05-0017 CV (RRB)**

(a) the Director of Public Works had previously shown evidence of his favoritism and bias toward the local gentleman;

(b) The City concluded that, although it had to offer the lease at public auction, its Charter provided that "the council may in its discretion reject any and all bids," which provision it relied on in granting the contract to the lower bidder;[2]

(c) The Colorado-based business outbid the Arizona business by 1% of gross monthly rentals;[3]

(d) The City Council's comments in deliberating over the bids was "very enlightening," demonstrating bias by some members in favor of the local businessman. Brown v. City of Phoenix, 272, P.2d at 360;[4]

The Court concluded that the discretionary power the City granted itself to reject any and all bids could not be exercised arbitrarily or capriciously. On this point, the Court observed:

> It was within the discretionary power of the council to award the lease to the less favorable bidder, providing that after due investigation into the facts they fulfilled the trust imposed on them in the disposition of the public's property, exercised a reasonable, honest, and prudent decision, and concluded it was in the best interests of the city and taxpayers to do so. Can it be said that this high trust was here fulfilled? We think not. If a lease may be granted to the lower bidder because members of the council have a sense of loyalty to him for past services rendered (without public bidding, we note), or because he renders fine services to the public in other cities, or because he has pioneered in the business, or is recommended by sundry personages, while at the same time the high bidder could render equal services and perform as well, and is equally responsible, then by a reductio ad absurdum the lease might be granted to one who bid one percent of his gross income because he had six children to support, was hale-fellow-well-met, or voted the straight 'vegetarian ticket'. Such nonsense serves only to illustrate that the word 'discretion' does not mean 'caprice', and that discretion cannot operate in a void, but only upon facts which are material to the matter under consideration.

---

[2] Similar language exists in KGB's bid documents. See Merrell Affidavit, Exhibit D, item 1.
[3] By contrast to this relatively small difference, the difference between Pool's bid and the bids made by Schade and Merrell is hundreds of thousands of dollars.
[4] Compare the biased but relatively mild comments by council members in Brown to the more pointed public epithet of "carpetbaggers" applied by the KGB Assembly member to out-of-town bidders like Schade and Merrell.

*Joergen Schade and Robert Merrell v. Ketchikan Gateway Borough and Charles Pool*
**Amended Memorandum in Support of Injunctive Relief; Page 9 of 13; Case No. J05-0017 CV (RRB)**

Brown v. City of Phoenix, 272, P.2d at 363. The Court cited with approval the case of State ex rel. Journal Printing Co. v. Dreyer, 183 Mo. App. 463, 167 S.W. 1123, 1130 which enunciated the following rule:

> Though the right to reject bids be reserved, nevertheless the officers intrusted [sic] with the public duty in question are not free to act arbitrarily through caprice, favoritism, by collusion, and in bad faith, thereby abusing the discretion reposed in them, or failing to exercise the same.

The Court, however, later noted that the fact that "there was no evidence of fraud or corruption on the part of the city council, and that what they did was done openly and above board" still did not "cure the evil complained of, i.e., favoritism." Brown v. City of Phoenix, 272, P.2d at 364. Defendants in the case belatedly suggested that perhaps the 18% bid was not the high bid after all because the lower bidder might do a greater volume of business and therefore be in reality the higher bidder. In addition to the fact that there was no evidence presented to support this contention, the Court noted that this factor was not one of the variables enumerated in the notice calling for bids and was therefore in effect a new requirement.[5] Brown v. City of Phoenix, 272, P.2d at 364.

The Court ultimately concluded, after reviewing the evidence in the light most favorable to the city, together with inferences properly deductible therefrom, that the trial court's finding that the city council "did not act in an illegal, unfair or arbitrary manner, nor did it act in bad faith" was clearly erroneous. Brown v. City of Phoenix, 272, P.2d at 364. The Court noted that the action of the city council "conclusively indicates a fixed intention to award the lease in question to Mr. Standish [the local resident]. It cannot be said that this award was made in the best interest of the city. The letting of contracts for public business should be above suspicion or favoritism." Brown v. City of Phoenix, 272, P.2d at 364 (parenthetical added).

Further, as noted by the Supreme Court of Hawaii, the bottom line in a public auction by a government entity is that, even if there was no evidence of fraud or favoritism, if the method employed provided "the opportunity for favoritism, extravagance, and improvidence in awarding a public contract, … the fact that the procedure was susceptible to abuse and

---

[5] Our facts are even more compelling--where there is a total absence of any logical rationale supporting the bizarre action by the assembly to low-ball the minimum bid and then to grant preferential rights that virtually assured substantially less money to KGB.

*Joergen Schade and Robert Merrell v. Ketchikan Gateway Borough and Charles Pool*
**Amended Memorandum in Support of Injunctive Relief; Page 10 of 13; Case No. J05-0017 CV (RRB)**

BAXTER BRUCE & SULLIVAN P.C.
P.O. Box 32819, Juneau Alaska 99803
Ph: (907) 789-3166
Fax: (907) 789-1913

manipulation rendered it illegal." Federal Electric Corporation v. Fasi, 527 P.2d 1284 (Hawaii 1974).

Here it seems that the method chosen by KGB did not merely provide an opportunity for favoritism. Rather, it seems to have been tailor-made for it. Thus the sale based on this method must be restrained.

## Count II (Estoppel Against KGB)

Under Alaska law, three requirements must be met to find estoppel against a municipal or state government entity. Municipality of Anchorage v. Schneider, 685 P.2d 94, 97 (Alaska 1984); Messerli v. Department of Natural Resources, State of Alaska, 768, P.2d 1112, 1121 (Alaska 1989):

(1) assertion of a position by conduct or word;

(2) reasonable reliance thereon; and

(3) resulting prejudice.

Estoppel will only be enforced to the extent justice requires. Municipality of Anchorage v. Schneider at 97.

All three elements are present here:

(1) By its conduct and words, KGB asserted that the First Auction would be conducted under the written rules set out in the bid documents provided to prospective bidders. Those written rules established minimum bids.

(2) Schade and Merrell were entitled to and did rely on the written rules. They were also entitled to and did rely on the fact that Pool's bid, although improperly entertained by KGB, given the written rules governing the auction, was later rejected as insufficient and that the First Auction ended without a sale of B-17.

(3) They were later prejudiced when unauthorized bids, not accepted in the First Auction, were belatedly brought over and used as the minimum bids in the Second Auction, accompanied by rights of first refusal to those who had made the unauthorized bids. Had they been properly notified of this intent at the First Auction, both Schade and Merrell could and would have bid higher than Pool on B-17, in order to avoid being disadvantaged in any future auction. Their later bids demonstrate that. However, they were denied the opportunity by KGB's failure to

properly and timely notify them of the intent to favor local bidders from the First Auction.

Therefore, KGB is and should be estopped to convey the property to Pool.

## Count III (Denial of Equal Protection)

The Second Resolution denied Schade and Merrell, as out-of-state bidders, equal protection of the law in comparison with local bidders, like Pool, who had submitted the high, yet below minimum, bids in an earlier auction. The result was an unfair, essentially rigged, bid process for these locals.

Of course, this classification by KGB did not plainly appear on the face of the Resolution. Rather, the circumstances leading up to and even subsequent to the enactment of the Second Resolution clearly show that it had this discriminatory intent or purpose. The circumstances also clearly show the corresponding discriminatory impact.

Plaintiffs were not allowed an equal chance in the competitive bidding, due to the undisclosed or belatedly disclosed preferential status given to these locals through rights of first refusal. Note that Plaintiffs do not contend that they have a constitutionally protected right to purchase public land. The decision to sell or not to sell is in the sound discretion of the governmental body, in this case KGB.

However, where the governmental entity has chosen to offer the public land for sale in a procedure billed as a public, competitive-bid process, open to local residents and out-of-state residents alike, each participant has a constitutionally protected right under the law that authorizes it for an equal chance and equal treatment with all other participants, to purchase that land. The Second Resolution denied this right to Schade and Merrell.

Because a suspect class, such as race or gender, is not involved here, a minimum level of scrutiny under the "rational basis" test enunciated by the United States Supreme court is applied to examine the governmental action—*i.e.* whether the classification is rationally related to a legitimate government purpose. Orleans v. Duke, 427 U.S. 297 (1976). Plaintiffs recognize the deference accorded by the Court to the government in a rational basis analysis. For example, in McGowan v. Maryland, 366 U.S. 420, 425-426 (1961), the Court declared that: "[s]tate legislatures are presumed to have acted within their constitutional power despite the fact that, in practice, their laws result in some inequality." However, there is a huge

BAXTER BRUCE & SULLIVAN P.C.
P.O. Box 32819, Juneau Alaska 99803
Ph: (907) 789-3166
Fax: (907) 789-1913

difference between some inadvertent or unintended inequality and what KGB did here. The evidence in this case, as discussed above in the section dealing with the state claim of arbitrary and capricious conduct by KGB, shows that there is no absolutely no rational relationship here, either expressed in the recitals of the Second Resolution itself, or conjured after the fact, between a legitimate governmental purpose and the classification KGB employed to discriminate.  Moreover, even under the "rational basis" test, and notwithstanding this deference and presumption applied by the Court since 1937 regarding government economic and social regulations, the Court occasionally has found that a government purpose was not legitimate. Romer v. Evans, 576 U.S. 620 (1996).  Plaintiffs believe this case clearly demonstrates the absence of a rational relationship to a legitimate government purpose.  The Second Resolution, or at least the offending portions setting the Revised Minimum Bids and awarding rights of first refusal, should be stricken and set aside as violative of the equal protection clause of the Fourteenth Amendment.  U.S. Const. Amend. XIV, § 1.

DATED this 5th day of January, 2006.

BAXTER BRUCE & SULLIVAN P.C.

s/Richard L.Nelson
P.O. Box 32819
Juneau, Alaska 99803
Phone: (907) 789-3166
Fax: (907) 789-19193
E-mail: rnelson@baxterbrucelaw.com
ABA No. 0209036

### CERTIFICATE OF SERVICE

I hereby certify that on this 5th day of January, 2006, a copy of the foregoing was served electronically on Scott Brandt-Erichsen, and on Mitchell A. Seaver, 344 Front Street, Ketchikan, Alaska 99901, and Geoffrey Currall, Keenan & Currall P.C., 540 Water St. Suite 302, Ketchikan 99901 by facsimile and regular mail.

s/ Richard L. Nelson

*Joergen Schade and Robert Merrell v. Ketchikan Gateway Borough and Charles Pool*
**Amended Memorandum in Support of Injunctive Relief; Page 13 of 13; Case No. J05-0017 CV (RRB)**