Geoffrey G. Currall, Esquire
Alaska Bar No: 7011053
KEENE & CURRALL, P.C.
540 Water Street, Suite 302
Ketchikan, Alaska  99901
Phone: (907) 225-4131
Fax: (907) 225-0540
E-mail: info@keenecurrall.com

Attorneys for Defendant, Charles Pool

## UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| JOERGEN SCHADE and ROBERT MERRELL, <br><br> Plaintiffs, <br><br> v. <br><br> KETCHIKAN GATEWAY BOROUGH and CHARLES POOL, <br><br> Defendants. | Case No.  J05-0017 CV (RRB) |

### POOL'S OPPOSITION IN RESPONSE TO MOTION FOR TEMPORARY RESTRAINING ORDER

**I.    Introduction and Statement of Pertinent Facts.**

Charles Pool ("Pool") hereby opposes Plaintiffs' Joergen Schade ("Schade") and Robert Merrell's ("Merrell") Motion for Temporary Restraining Order (the "Motion").  Plaintiffs fail to meet their burden as they are unable to demonstrate either a probability of success on the merits or that a balance of the hardships favors plaintiffs, especially considering the substantial injury to Pool, the Ketchikan Gateway Borough ("KGB") and the public.  Therefore, the Court should deny the motion for a temporary restraining order which will further delay the sale of the subject real property to Pool.

POOL'S RESPONSE IN OPPOSITION TO MOTION FOR TRO - Page 1 of 19
*Schade and Merrell v. KGB and Pool* - Case No.  J05-0017 CV(RRB)
Rd/farrel on server/clients/Pool, Charles, 25.109.D/Opposition to TRO

First, an accurate recitation of the facts is necessary as Plaintiffs' complaint and affidavits contain numerous inaccuracies, omissions, biases, innuendos and statements that are flat-out wrong. For example and, most prominently, Plaintiffs describe themselves as the "highest" bidders and Mr. Pool as the "lower bidder." In fact, Mr. Pool was the only bidder, and thus the "highest" bidder, at a first auction and then exercised a right of first refusal offered to him by KGB to purchase the property at the same bid price given by Schade. See First Amended Complaint, ¶8. Second, Plaintiffs primary contention is that Pool was improperly granted a first right of refusal, especially in light of an allegedly much higher "offer" from Plaintiff Merrell. Merrell, in fact, was the first and only person to demand a right of first refusal. This was made in his August 10, 2005 "Binding Letter of Intent" which required a 60 day inspection and "due diligence" period after acceptance of the "offer," a "stand still" agreement and a closing 120 days after the 60 day inspection period. See Exhibit A to Affidavit of Robert Merrell "Binding Letter". Thus, Merrell's "offer" granted himself many rights not available at the auction, including the right of first refusal on another property, which obviously would significantly effect the value of the offer and could not reasonable be compared to offers made on the Borough's offered terms.

A.   **The First Auction.**

On March 21, 2005, KGB Assembly passed Resolution 1881 approving a public outcry auction for Borough land on the East side of Ward Cove. KGB wished to sell this property for a number of reasons: (1) KGB was paying tremendous carrying costs for holding the land for over 2 years, (2) KGB wished to get the property onto the public tax rolls, (3) KGB determined that a

**POOL'S RESPONSE IN OPPOSITION TO MOTION FOR TRO** - Page 2 of 19
*Schade and Merrell v. KGB and Pool* - Case No. J05-0017 CV(RRB)
Rd/farrel on server/clients/Pool, Charles, 25.109.D/Opposition to TRO

public outcry action would yield the highest price for the subject land.[1]

Despite expressing his interest in the property (B-17) for several years, Pool did not personally receive notice of the KGB auction. In fact, no one, whether local or not, received personal notice of the auction from KGB.[2] Rather than determine whom interested bidders may be and send out personal invitations to the public auction, KGB published notice of the auction.[3] KGB also sent bid documents to everyone that requested them, whether local or not, including plaintiffs.

On August 4, 2005, KGB conducted a public outcry auction ("First Auction") of significant portions of property at Ward Cove, Alaska, pursuant to Resolution 1881. Exhibit 1 to KGB Response in Opposition, Resolution 1881. Four parcels did not receive the minimum bid stated in the auction packet. Those in charge of the auction, including the Borough Attorney, determined that the Borough Assembly would entertain offers on the four parcels. In fact, the opening page of the bid packets, which were available to the public and delivered to Mr. Schade and Mr. Merrell, stated that "[i]t is further understood that any announcements made the day of

---

[1] KGB has reportedly entered into an agreement to sell a large parcel on the West side of Ward Cove to a Ted Falconer and Renaissance Development Group (from Washington and Arizona, respectively) in a private sale for less than half of the assessed value. Falconer/Renaissance was the group referred to by one Borough Assembly member, Mr. Thompson, in a meeting discussing this private sale on September 19, 2005 as a "carpetbagger." This discussion had nothing to do with the subject property(ies), Resolutions 1881 and 1906, the Plaintiffs, the auctions or the sales. See Exhibit 16 to KGB's Response in Opposition, Transcript of September 19, 2005 Borough Assembly meeting, pg. 23, ln. 6.

[2] This fact, however, did not lead Pool to believe his "participation was not really desired by some people in KGB." See Complaint, ¶10.

[3] Based on information and belief, notice of the public auction was published in over 18 cities.

**POOL'S RESPONSE IN OPPOSITION TO MOTION FOR TRO** - Page 3 of 19
*Schade and Merrell v. KGB and Pool* - Case No. J05-0017 CV(RRB)
Rd/farrel on server/clients/Pool, Charles, 25.109.D/Opposition to TRO

the sale supersede any and all advertising or printed material previously distributed." Exhibit C to Pool's Response in Opposition, pg. 2.

The auction officials understood KGB's intent to sell the parcels and believed that they should make some attempt to obtain offers on the four parcels to take to the Borough Assembly for consideration. These officials also determined this would best be done while many interested buyers were already present. See Exhibit 7 to KGB Response in Opposition, Transcript of August 15, 2005 Assembly meeting, pg. 8.

At this stage of the auction Mr. Pool placed the highest and only bid for B-17 at $600,000.[4] Bids were also received for three other parcels. Neither Schade nor Merrell made any bid for B-17 at any price. Schade gave no indication to KGB that he wished to bid on this parcel, even at an amount less than the proposed minimum bid. Schade also failed to raise any issue with regard to the legitimacy of KGB's decision to entertain lower bids at this time.

On August 10, 2005, Plaintiff Merrell sent KGB a "binding letter of intent" which Plaintiffs now describe as an "offer" on B-17. See Exhibit A to Affidavit of Robert Merrell, "Binding Letter". This "offer," *inter alia*, demanded a right of first refusal on B-36. The "offer" set up different prices for different groups of properties, but should KGB accept the offer on any, the offer required a 60 day inspection and "due diligence" period. The offer also required a "stand still" agreement and a closing 120 days after the 60 day inspection period (i.e. closing 180 days after acceptance). See id. Merrell's "offer" gave the purchaser many rights not available at the

---

[4] Pool signed a form Agreement for Auction Sale of Real Property, which is attached hereto as Exhibit A.

**POOL'S RESPONSE IN OPPOSITION TO MOTION FOR TRO** - Page 4 of 19
*Schade and Merrell v. KGB and Pool* - Case No. J05-0017 CV(RRB)
Rd/farrel on server/clients/Pool, Charles, 25.109.D/Opposition to TRO

First Auction, including the right of first refusal on another property. These terms affected the value of the offer and could not reasonably be compared to offers made on the Borough's terms offered at the First Auction. This fact is also made clear by the fact that Merrell only bid $810,000 at the Second Auction, as opposed to his alleged previous "offer" of $934,830. As this offer was outside of the auction context KGB was considering, the offer was determined to be outside the requirements set by the Borough Assembly and was rejected.

### B. The August 15, 2005 Assembly Meeting.

The KGB Assembly discussed the First Auction and the provisional bids at their regular meeting on August 15, 2005. Attached to KGB's Response in Opposition, Docket 25, as Exhibit 7 are transcripts of the relevant portions of that meeting. During this meeting, the Assembly was concerned that if the minimum bids were rejected they may receive lower or no bids at a second auction. Not wishing to "take points off the scoreboard" the Assembly decided to send the parcels back out for bid setting new minimum bids at the amount of the offers received during the First Auction. See Exhibit 7 to KGB's Response in Opposition at pg. 28. The Assembly also, for the first time, considered and granted the highest bidders at the First Auction a Right of First Refusal (the "Right"). This Right was granted based on the historical precedent of the State of Alaska giving a right of first refusal to the City, which was cited by an Assembly member during the meeting.[5] See Exhibit 15 to KGB's Response in Opposition.

There is no evidence that this Right was granted to give local bidders a preference or that it was somehow secretly inserted into Resolution 1906 Amended. This Assembly meeting was

---

[5] This point is more fully addressed in KGB's Response in Opposition, Docket 25, pg. 19

POOL'S RESPONSE IN OPPOSITION TO MOTION FOR TRO - Page 5 of 19
*Schade and Merrell v. KGB and Pool* - Case No. J05-0017 CV(RRB)
Rd/farrel on server/clients/Pool, Charles, 25.109.D/Opposition to TRO

open to the public and broadcast on community television. Neither Schade nor Merrell, who now claim to have remained "seriously interested" in one of the four parcels at this point, made comments at or objected to the Assembly granting a right of first refusal. KGB made no secret of the Right, which was first considered and granted at that Assembly meeting.[6] The minutes of this Assembly meeting, noting the grant of a Right, were posted online and available to anyone with internet access.[7] At the subsequent meeting on September 6, 2005, the Assembly merely passed the Resolution per the discussion on August 15, with no discussion regarding the Right.

During the Borough Assembly meeting on August 15, 2005, and after much discussion, the previously prepared Resolution 1906 was rejected (which would have sold the properties to those that made bids at the first auction) and the Assembly directed staff to draft Resolution 1906 Amended with language regarding both the 30 day "Second Auction" and the Right included. Thereafter, Mr. Pool received a letter dated August 26, 2005, advising him that pursuant to Assembly direction at its August 15, 2005 meeting he would be granted a right of first refusal.[8] See Exhibit B hereto.

---

[6] Plaintiffs argument is premised on the assumption that by granting the Right on these four parcels, the values of those properties was diminished and bidding was chilled. Plaintiffs offer no support or evidence to support this assumption. Plaintiffs also fail to offer evidence that all four bidders on these below-minimum offers were "locals."

[7] Plaintiffs pepper their pleadings and briefing with innuendo that the Assembly and KGB had some intention prior to and after the meeting to hide or keep secret this right of first refusal. This contention is totally baseless as demonstrated by the public documents that are attached as Exhibits.

[8] It should be noted that this occurred well in advance of the September 6, 2005 Assembly meeting, at which meeting Plaintiffs assert the Right was first inserted into the auction process.

POOL'S RESPONSE IN OPPOSITION TO MOTION FOR TRO - Page 6 of 19
*Schade and Merrell v. KGB and Pool* - Case No. J05-0017 CV(RRB)
Rd/farrel on server/clients/Pool, Charles, 25.109.D/Opposition to TRO

### C. The September 6, 2005 Assembly Meeting and Second Auction.

Resolution 1906 was amended by staff and approved at the September 6 Assembly meeting to conform to directions given on August 15, but no changes were made regarding the Right at the September meeting.[9] See Exhibit 11 to KGB's Response in Opposition, Transcript of September 6, 2005 Assembly Meeting. In fact, the Right was never discussed at this second meeting where Resolution 1906 Amended was approved.[10] The Second Auction left the parcels up for open bid for 30 days to all comers, whether "local" or not.

At the second auction, Plaintiffs Schade and Merrell bid on B-17. Notable, neither bid anywhere near the $934,830 Merrell had previously "offered" to KGB. At the conclusion of the second auction, Mr. Pool exercised his Right and entered into an Agreement with KGB on October 4, 2005, to purchase the property at $815,000.[11] Closing was set for January 3, 2005.

///

---

[9] This is contrary to the affidavits of Plaintiffs and the pleadings they have offered claiming that the Right was somehow secret and first introduced at the September 6, 2005 meeting.

[10] This fact displays one of Plaintiffs' most blatant misrepresentations to the Court and also Plaintiffs' rush to Court before reviewing any of the facts. Plaintiffs' Memorandum states: "Notably, the original Resolution 1906, upon information and belief, provided for a straightforward, even-handed public auction, **without unlawful preferences** [i.e. right of first refusal]. Schade and Merrell believe that the discussion in the Assembly meeting(s) that led to "Resolution 1906 Amended" which included the Revised Minimum Bids and the **nefarious rights of first refusal may hold clues to the favoritism and manipulation** that now seem obvious under the circumstances." Amended Memorandum, pg. 8, lns. 6-11. As can easily be seen from the Transcripts of the meetings, Plaintiffs are flat-out wrong. The Right was first discussed and added at the first meeting on August 15, 2005. There is no discussion at the September 6, 2005 meeting about the right.

[11] Pool's purchase agreement was at the highest bid offered during the open auction, despite

POOL'S RESPONSE IN OPPOSITION TO MOTION FOR TRO - Page 7 of 19
*Schade and Merrell v. KGB and Pool* - Case No. J05-0017 CV(RRB)
Rd/farrel on server/clients/Pool, Charles, 25.109.D/Opposition to TRO

## II. Legal Standards for Preliminary Injunction.

Federal Rule of Civil Procedure, Rule 65, authorizes injunctive relief only under specified conditions. As stated in Rent-A-Center, Inc. v. Canyon Television and Appliance Rental, Inc., 944 F.2d 597 (9th Cir. 1991), "[p]reliminary injunctive relief is appropriate when a plaintiff establishes (1) probable success on the merits and irreparable harm if relief is denied, or (2) that there are serious questions on the merits and the balance of hardship tips sharply in favor of plaintiff." Id. at 602. The test represents "a single continuum of concern which evaluates two factors that must always be considered: 'The likelihood of the plaintiff's success on the merits; and the relative balance of hardships to the plaintiff, defendant, and public.'" Id. (quoting State of Alaska v. Native Village of Venetie, 856 F.2d 1384, 1389 (9th Cir. 1988)). However, even if damages are an inadequate remedy, the [Plaintiffs] must also show a reasonable likelihood of prevailing on the merits before a preliminary injunction can issue. See Number One Rent-A-Car v. Ramada Inns, 94 Nev. 779 (1978). Thus, the burden of proof is on the Plaintiffs'.

Alaska Statute 29.35.090 addresses municipal property and states in pertinent part:

> The governing body shall by ordinance establish a formal procedure for acquisition and disposal of land and interests in land by the municipality."

Thus, one must refer to the ordinances of the particularly municipality for instruction on how it disposes of land. In this case, Ketchikan Gateway Borough Code 40.18.010 states, in pertinent party:

> [The] borough may sell, lease, exchange or otherwise dispose of real property... when and upon such terms and conditions as the

---

Plaintiffs' purposeful misdirection that Pool somehow could purchase the lot for $600,000.

**POOL'S RESPONSE IN OPPOSITION TO MOTION FOR TRO** - Page 8 of 19
*Schade and Merrell v. KGB and Pool* - Case No. J05-0017 CV(RRB)
Rd/farrel on server/clients/Pool, Charles, 25.109.D/Opposition to TRO

assembly, **in its sole discretion**, determines by resolution to be in the best interest of the borough. (Emphasis added).

The KGB ordinance does not require the Borough to dispose of land by auction, or even to the highest bidder. Complete discretion is left to the Borough Assembly. Therefore, to succeed on the merits, Plaintiffs have the burden to prove a cognizable violation of Borough Code 40.18.010.

### III.   Argument.

#### A.   There Was No Local Bias.

Plaintiffs' twisted interpretation of innocent events and the unproven allegations of their affidavits do not support the favoritism they read into the auction and sale to Pool. Plaintiffs' are simply suffering the ill feelings of bidders' remorse. Each chose not to bid at all in the first auction and then did not bid an amount higher than Mr. Pool was willing to pay for the property. Notably, Plaintiff Merrell was the first and only bidder to request a right of first refusal and failed to bid anywhere near his purported "offer" amount of $934,830 made prior to the Second Auction. Though disguised in the affidavits and argument, both Plaintiffs were clearly aware that the high bidder in the first auction had been given a right of first refusal to purchase the property at the price of the highest bid at the second auction prior to making their bids. This information was public and never kept secret, nor is there any evidence whatsoever that the Borough Assembly set up the process in order to assure that "local" bidders won. Despite the hyperbole used in the Motion, Plaintiffs fail to point to any evidence that the Assembly gave a preference to any "local."

Plaintiffs favoritism fabrication begins with their allegation that the KGB exhibited "an odd reluctance… to provide notice to them of both auctions." Motion, pg. 8, ln. 1-2. Plaintiffs' assert that because the KGB did not call or mail notice of the auction to each of them personally,

POOL'S RESPONSE IN OPPOSITION TO MOTION FOR TRO - Page 9 of 19
*Schade and Merrell v. KGB and Pool* - Case No. J05-0017 CV(RRB)
Rd/farrel on server/clients/Pool, Charles, 25.109.D/Opposition to TRO

the KGB was trying to somehow prevent them from bidding, in favor of "local" interests. To borrow Plaintiffs' terminology, such an interpretation is "ludicrous." No one received personal invitations to the auction. The KGB did not independently call or mail any individual person notice of the August 4, 2005, auction. Pool did not receive any personal notice from KGB like that expected by Plaintiffs, despite the fact that he was a "local" who had expressed interest in the property for years and had previously executed a purchase agreement for the adjacent property. See Affidavit of Charles Pool ¶6. Instead and reasonably so, KGB published notice of the auction and sent bid packets to anyone who requested them. See Plaintiffs' Affidavits.

Plaintiffs also complain repeatedly that accepting below minimum bids on a provisional basis was illegal, unfair and against the very rules set out by the Borough. First, the bids packets cited by Plaintiffs gave notice that announcements at the sale could supersede any printed material. See Exhibit A, First Auction Bid Packet, page 2. The auction officials, which included the Borough attorney, determined it would be appropriate to obtain bids on the four parcels that were not binding on the Borough. As established in the Borough ordinance 40.18.010(a), the Borough could have simply determined to sell the parcels to those bidders by resolution at the following Borough Assembly meeting (because the Borough was granted such authority under state law and by its ordinances to do so. In fact, Plaintiffs' counsel conceded this point in an exhibit to Plaintiffs' Motion. See Exhibit D to Schade Affidavit, Letter from Plaintiffs' counsel to Scott Brandt-Erichsen, dated September 30, 2005 "while the Borough could have made the decision in August to sell the parcel to Mr. Pool for $600,000…").

The very fact that the Borough did not accept those provisional bids and put the parcels

**POOL'S RESPONSE IN OPPOSITION TO MOTION FOR TRO** - Page 10 of 19
*Schade and Merrell v. KGB and Pool* - Case No. J05-0017 CV(RRB)
Rd/farrel on server/clients/Pool, Charles, 25.109.D/Opposition to TRO

back out for auction again to all comers (not just locals) eviscerates Plaintiffs entire argument. Plaintiffs claim that the KGB's intention, in constructing the entire Second Auction process was not to obtain a higher monetary price for these four parcels, but to direct these parcels to "locals." If this were truly the Borough's intention, it could have simply sold the parcels to those bidding the minimums during its August 15, 2005 meeting, who by coincidence happened to all be "local" residents. However, by putting the parcels out to bid again, these "locals" were forced to raise their offers, if they wanted the property, to whatever anyone else bid, even if an "out-of-towner" bid more than a "local" could afford.[12] Here, Plaintiffs are simply upset that they failed to bid an amount higher than Pool was willing to pay and have therefore constructed a paranoid fantasy that the citizens and officials of Ketchikan were committing the "ultimate caprice" against them.

As described above, the explanation for using the below minimum offers made at the First Auction as the minimums for the Second Auction was to obtain the highest price for the Borough and its citizens. The Assembly did not want to "take points off the scoreboard." See Exhibit 7 to KGB's Response to Motion, Transcript of August 15, 2005, Borough Assembly Meeting, pg 28. The transcripts also show that the Borough was afraid of simply doing a new auction, which would result in longer delays, holding costs and could result in the Borough receiving even lower bids than at the First Auction.

**B.    Plaintiffs Cannot Show a Likelihood of Success on the Merits.**

In order to obtain a TRO, Plaintiffs must show that they have a likelihood of success on

---

[12] The fact that a Second Auction was conducted, rather than simply resolving to sell the parcels to the "locals" also deflates Plaintiffs' argument that the Borough intended to stifle or chill bidding on these parcels. See, e.g., Amended Memorandum, pg. 7, lns.19-23.

POOL'S RESPONSE IN OPPOSITION TO MOTION FOR TRO - Page 11 of 19
*Schade and Merrell v. KGB and Pool* - Case No.  J05-0017 CV(RRB)
Rd/farrel on server/clients/Pool, Charles, 25.109.D/Opposition to TRO

the merits of their claims. Plaintiffs' state law and equal protection claims turn upon the factual assumption that KGB and the Borough Assembly acted with the intention to benefit locals to the detriment of "out of towners" like Schade and Merrell. Plaintiffs must therefore show arbitrary and capricious conduct by KGB. As can clearly be seen by the statement of facts above and by a review of the Assembly meeting minutes, there was no intention to favor locals, nor any arbitrary and capricious conduct toward Plaintiffs. KGB simply wanted the properties sold. Without any facts to support their shadowy claims of caprice both their state and equal protection claims fail.

Plaintiffs' allege numerous KGB acts were made with improper intentions. The alleged acts, however, are based on incorrect and purposeful distortion of what Plaintiffs, upon information and belief, felt was improper. The true facts are made clear by a review of the Assembly meeting transcripts. The alleged caprice on the part of KGB is nonexistent as there is no evidence that Schade or Merrell's participation was unwelcome. Also, Merrell's $934,830 offer was made outside the bid process and properly rejected; his offer sought a right of first refusal and Merrell failed to bid $934,830 at the second auction.

It is also clear from the transcripts that KGB's primary concern was getting the highest possible amount for parcels and it did not want to lose the offered amounts at the First Auction or end up with no bid on the parcels. There is simply no evidence in the KGB minutes of bias or favoritism to "locals." As Plaintiffs cannot make a showing of favoritism or local bias on behalf of the Borough Assembly or KGB, Plaintiffs cannot show that KGB acted in an arbitrary and capricious manner. Their failure is even more evident in light of the liberal deference and presumptions granted to local governments in selling government property. See Cabana v.

POOL'S RESPONSE IN OPPOSITION TO MOTION FOR TRO - Page 12 of 19
*Schade and Merrell v. KGB and Pool* - Case No. J05-0017 CV(RRB)
Rd/farrel on server/clients/Pool, Charles, 25.109.D/Opposition to TRO

<u>Kenai Peninsula Borough</u>, 50 P.3d 798, 803 (Alaska 2002) citing <u>McCormick v. City of Dillingham</u>, 16 P. 3d 735, 738 (Alaska 2001). Thus, Plaintiffs fail to meet their burdens to show a violation of Alaska state law. Their equal protection claims also fail as KGB clearly had a rational basis upon which to offer the Right to Pool. See e.g., <u>Reed v. Reed</u>, 404 U.S. 71, 76 (1971).

Plaintiffs rely heavily upon the decision of <u>Brown v. City of Phoenix</u>, 272 P.2d 358 (Arizona 1954) to support their arbitrary and capricious arguments. <u>Brown</u>, however, can easily be distinguished on several points. First, <u>Brown</u> is not binding authority as it is a dated opinion from the Arizona Supreme Court in 1954. Second, <u>Brown</u> involved a city council accepting a lower lease bid (i.e. a local's 17% bid over another's 18% bid). Here, the Assembly clearly **did not** accept a lower bid. Pool matched the highest bid made by of $815,000.[13] Pool, pursuant to his Right, has tendered to KGB $815,000. In <u>Brown</u>, the City accepted a lower bid, but here Pool's payment is not lower than Schade's offer. Third, <u>Brown</u> is also distinguishable because the statute therein required leases bid at public auction to be awarded to the **highest responsible bidder**. There is no such requirement here. The KGB ordinance at issue does not require disposal of land by public auction, or even to be sold to the highest bidder at the auction. The ordinance only requires the Assembly's determination, in its **sole discretion**, that the sale is in the best interests of the public. Here, the Assembly has achieved a sale at the highest bid by Pool's agreement to pay the highest bid amount.

---

[13] Merrell's August 10 "offer" attached many special contingencies, escape clauses, and duties for the Borough and cannot be fairly characterized as bid, especially in light of the fact that Merrell **never** bid this amount at either auction.

POOL'S RESPONSE IN OPPOSITION TO MOTION FOR TRO - Page 13 of 19
*Schade and Merrell v. KGB and Pool* - Case No. J05-0017 CV(RRB)
Rd/farrel on server/clients/Pool, Charles, 25.109.D/Opposition to TRO

Finally, Plaintiffs argument that the Borough cannot sell to Pool is contrary to Merrell's August 10 offer to purchase the parcel outside the auction. The "offer" makes clear that Merrell believed KGB could privately sell any parcel to whomever it pleased outside of the auction process authorized in Resolution 1881. Plaintiffs' counsel has also conceded that KGB could have sold B-17 to Pool for $600,000 after the first auction.

### C. A Balance of Hardships Favors Defendants and the Public; the Balance Does Not Tip Sharply in Favor of Plaintiffs.

#### 1. Damage Suffered by Pool if Sale is Delayed.

Mr. Pool was and remains ready to close on his purchase of the property at issue. Pool Affidavit ¶14. KGB and Mr. Pool signed a purchase agreement with respect to the property on October 5, 2005 and since that time Pool has worked with third parties to negotiate substantial contracts that depend on Mr. Pool's ownership and possession of the property. Pool Affidavit ¶17-27. The Pool Affidavit, filed herewith, provides an overview of the damages Pool has incurred and the substantial damages Pool will incur if closing does not occur by the end of January. See generally, Pool Affidavit. A further delay will also harm the public entity that is currently seeking to lease the property from Pool.

#### 2. Harm to KGB and Public.

The harm suffered by KGB is more accurately described in its Opposition to the Motion. Several relevant points regarding KGB's harm should be noted. First, KGB's primary reason for conducting the sale was to avoid the substantial carrying costs KGB incurred in maintaining these properties over several years. The longer a sale is delayed the longer KGB will be forced to pay the carrying cost for this property and others. Second, with the property

POOL'S RESPONSE IN OPPOSITION TO MOTION FOR TRO - Page 14 of 19
*Schade and Merrell v. KGB and Pool* - Case No. J05-0017 CV(RRB)
Rd/farrel on server/clients/Pool, Charles, 25.109.D/Opposition to TRO

owned by KGB, the properties were not bringing in any tax revenue. Again, the longer the delay, the longer until the property can generate revenue for KGB and the public. Also, if a TRO is granted, KGB will lose additional staff time and resources needed to dedicate to defend against Plaintiffs' claims. Finally, if a temporary restraining order is granted, the process involving the two other parcels sold below the minimum may be called into question and entangle the Borough in additional lawsuits.

Any harm to KGB is also a harm to the public that the KGB serves. In addition, however, there is additional harm to the public in the frustration of Pool's attempts to lease the property to a public entity that serves the public.

### 3.  Plaintiffs are Not Faced with Irreparable Harm.

Plaintiffs appear to rely entirely upon the notion, without citation to authority, that actions that in any manner involve real property, the result is irreparable harm to a plaintiff due to real property's unique nature. However, in this case Plaintiffs do not claim an interest in or right to possession of the real property. Plaintiffs only claim is for a right to have another opportunity to bid on a property. Plaintiffs' best hope for success would be for the Court to order a new auction. This result does not give either Plaintiff a right to title or possession to the real property in dispute. Plaintiffs' best result therefore is an opportunity to bid, for a third time, on a property for which Pool has already successfully bid twice. As shown above, Plaintiffs had several earlier opportunities to obtain B-17, but chose on several occasions to wait for a lower price. Having now missed out, they cannot in good faith claim "irreparable harm."[14] In fact, Pool currently has

---

[14] Plaintiffs' admit they were afforded an opportunity to bid at the First Auction and in fact

POOL'S RESPONSE IN OPPOSITION TO MOTION FOR TRO - Page 15 of 19
*Schade and Merrell v. KGB and Pool* - Case No. J05-0017 CV(RRB)
Rd/farrel on server/clients/Pool, Charles, 25.109.D/Opposition to TRO

the highest and best claim to title of the real property at issue as he has entered and performed all his obligations under his Sale Agreement with KGB. Therefore, if anyone is likely to suffer irreparable harm with regard to this heavy industrial commercial property, it is Mr. Pool, not Plaintiffs.

Moreover, Plaintiffs' interest in the property is as a business holding, the value of which potential business, should one of the Plaintiffs succeed in purchasing at auction, can be estimated. Thus, Plaintiffs potential damages are not irreparable (or any more so than the potential harm to Pool) by the mere fact that this real property may or may not be unique.

Plaintiffs also make much of Merrell's contingent "offer," with its right of first refusal, 60 day inspection/due diligence, and 120 day closing with a $934,830. However, Merrell failed to make an offer of this amount at the first auction and also failed to make an offer of this amount afterwards with terms similar to those offered by the Borough. Plaintiffs thereafter failed to attend, telephone or send written comments to the Borough Assembly meetings on August 15 and September 6 (which meetings were published in advance) and failed to object to the Right offered by the Borough prior to the conclusion of the Second Auction. During the 30 day Second Auction, Merrell failed to repeat his alleged offer of $934,830. Finally, Plaintiffs offered $810,000 and $815,000, neither amount being higher than Pool was willing to pay, despite the fact that both knew he had an option to purchase at that amount.

Plaintiffs' have caused their own harm, to the extent that have suffered, by failing to bid,

---

Schade succeeded in purchasing several other properties at the auction. Plaintiffs' also admit to having input into the auction process to the extent that one of them convinced the Borough to hold a public outcry auction rather than a sealed bid auction. See Affidavit of Schade, ¶6.

**POOL'S RESPONSE IN OPPOSITION TO MOTION FOR TRO** - Page 16 of 19
*Schade and Merrell v. KGB and Pool* - Case No. J05-0017 CV(RRB)
Rd/farrel on server/clients/Pool, Charles, 25.109.D/Opposition to TRO

failing to participate in the public meetings and decision process, and failing to bid an amount higher than Pool was willing to pay. They shorted themselves by trying to extract a "deal" out of KGB and are now bitter they didn't win their gambit.

In sum, Plaintiffs claim is simply sour grapes over losing their poker game. Plaintiffs had at least three separate opportunities to make their best offer to KGB, but instead held their hands close and are now upset that they did not raise their bet. Plaintiffs now simply wish to have yet another bite at the apple.

### D.    Plaintiffs Have Not Raised Serious Questions on the Merits.

As shown in the statement of facts above, Plaintiffs have fabricated a story with many holes, few real facts, and no citation to the publicly available Borough Assembly minutes. Plaintiffs' gripe with KGB is not serious, as demonstrated in counsel's letter which concedes that KGB could have simply sold B-17 to Pool for $600,000. Instead, by public auction, KGB obtained a price $215,000 higher. This disproves Plaintiffs' theory that KGB wished to chill bidding and reserve these properties for locals.[15] Moreover, Plaintiff's have not raised "serious questions" on the merits as demonstrated throughout their filings. Plaintiffs failed to review publicly available meeting minutes, did not request transcripts of Assembly meetings from the Borough, and otherwise failed to investigate before bringing their claims to court; the questions raised by Plaintiffs are frivolous as they are easily resolved upon inspection of the Assembly meeting transcripts.

---

[15] To be absolutely clear, KGB is not required to sell all property by public auction. KGB is legally entitled to simply enter into private negotiations with any local or alien to sell Borough property.

POOL'S RESPONSE IN OPPOSITION TO MOTION FOR TRO - Page 17 of 19
*Schade and Merrell v. KGB and Pool* - Case No. J05-0017 CV(RRB)
Rd/farrel on server/clients/Pool, Charles, 25.109.D/Opposition to TRO

## IV. Conclusion.

For the foregoing reasons, the Court should deny Plaintiffs' Motion for a Temporary Restraining Order and allow the delayed closing to proceed immediately. Should the Court enter a Temporary Restraining Order, a bond in an amount no less than $2,700,000 should be required to compensate Pool for his losses incurred in any significant delay in the sale. A separate bond should be posted by Plaintiffs to compensate KGB for its losses, which the KGB can better approximate than Pool.

Dated this 6 day of January 2006.

KEENE & CURRALL
A Professional Corporation
Attorneys for Defendant, Charles Pool

By _____
Geoffrey G. Currall, Esquire
Alaska Bar No: 7011053

**POOL'S RESPONSE IN OPPOSITION TO MOTION FOR TRO** - Page 18 of 19
*Schade and Merrell v. KGB and Pool* - Case No. J05-0017 CV(RRB)
Rd/farrel on server/clients/Pool, Charles, 25.109.D/Opposition to TRO