**Richard L. Nelson**
**ABA No. 0209036**
**Baxter Bruce & Sullivan, P.C.**
**P.O. Box 32819**
**Juneau, Alaska 99803**
**phone: (907) 789-3166**
**fax: (907) 789-1913**
**rnelson@baxterbrucelaw.com**
**Attorneys for Plaintiffs**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| **JOERGEN SCHADE and ROBERT MERRELL** ) ) ) | |
| Plaintiffs, ) ) | |
| vs. ) ) | |
| **KETCHIKAN GATEWAY BOROUGH and CHARLES POOL** ) ) ) | |
| Defendants ) | Case No. J05 - 0017 CV (RRB) |

## PLAINTIFFS' REPLY TO DEFENDANTS' OPPOSITIONS TO MOTION FOR INJUNCTIVE RELIEF

Pursuant to Local Rule 7.1(b), Plaintiffs submit this reply to the responses of Ketchikan Gateway Borough ("KGB") and Charles Pool ("Pool") to Plaintiffs' motion for injunctive relief.[1]

**Serious and Substantial Questions Going to the Merits/Probability of Success**

1. Plaintiffs have already shown both serious and substantial questions going to the merits of the dispute as well as probability of success on the merits. While the responses of

---

[1] To the extent that KGB has couched its response in terms of an affirmative motion of its own, i.e., as a Rule 12(b)(6) motion to dismiss or for summary judgment, Plaintiffs reserve the right to respond separately to such motion by 1/17/06, as permitted by order of the Court.

KGB and Pool are quite distinct from one another in tone,[2] they share a common characteristic, *i.e.*, the responses are most telling for what they do not say. For example, many of Plaintiffs' allegations, if untrue, could easily have been refuted, particularly by KGB. KGB is clearly in a superior position because it possesses or is able to obtain the information with which to refute them, if they can be refuted. However, not only were many of the alleged facts not negated by Defendants in their Responses, they were not even denied. Those facts include the following:

    a. No new resolution was ever passed by the KGB Assembly authorizing the departure from the auction rules regarding minimum bids for the outcry auction held on August 4, 2005 (the "First Auction").[3] Neither KGB nor Pool cited or attached any such resolution to its response.[4] Even if there had been, the *ad hoc*

---

[2] KGB's Response adopts a fairly reasonable, business-like tone, while Pool's Response adopts a decidedly more frontal assault. Pool launches into an attack, ultimately accusing Plaintiffs of purposeful misrepresentation to the Court. *See, e.g.,* Pool Response at p.7, footnote 10, and Plaintiffs' Reply at p.3, footnote 7. Plaintiffs invite the Court to examine their allegations closely as against any of Pool's accusations. Plaintiffs have misrepresented nothing to the Court. The facts are asserted in good faith, as are the claims on which they are based. Although Plaintiffs choose not to respond in kind by accusing Pool of intentional distortion, quite a number of inaccuracies in Pool's Response are evident. To find an example, one need look no further than Pool's very first accusation— that Plaintiffs represented themselves to be the high bidders while Pool was the lower bidder *in the First Auction. See* Pool's Response at p.2. No such contention has ever been made by Plaintiffs. However, Plaintiffs were in fact the high bidders *in the Second Auction,* and have so alleged. Plaintiffs' First Amended Complaint, ¶ 24. Unfortunately, Pool's other accusations, peppered throughout his Response, tend to be of the same tenor.

[3] As noted in Plaintiffs' Memorandum at p. 4, AS 29.35.090 requires that the municipality establish a formal procedure for sale of public land by ordinance. KGB did not have such an ordinance for this sale. Instead, under ordinance 40.10.010, KGB chose to establish the procedure for this auction by resolution---Resolution 1881. That resolution, which established the minimum bids, was never amended. Therefore the last minute *ad hoc* rules change at the auction was illegal. Contrary to Pool's argument that the bid documents published by the auction company provided that authority to change them (see Pool Response at Exhibit C, p.2), there is no such power under state law. Nor is there any ordinance or resolution of KGB which grants the auctioneer the right to change the rules established by KGB's Resolution 1881. If there were, KGB could simply ignore AS 29.35.090 and allow sales to be governed by whims of the auctioneer on the spot, or by the property manager's staff, or by a consultant. This admission was made by Assembly member Landis when he said, *"...it was done at the last second. Really by the – probably by the manager's staff in conjunction with the auction company, and the local consultant. So I don't necessarily agree that that was what was contemplated in the Resolution, the ADHOC Committee, or by anyone up until that point."* KGB Response, Exhibit 7, p. 28.

[4] KGB, however, argues in its Response that Plaintiffs have conceded KGB's ability to have conveyed the property to Pool at the First Auction, citing David Lawrence's letter of 9/30/05. KGB Response, p.24. The argument is not valid. That was the first letter, written only days after the conclusion of the second auction (9/20/05). Mr. Lawrence noted up front that "we have not made a complete investigation at this time…." Plaintiffs had only belatedly learned at the second auction that free rights of first refusal had been granted to bidders who had submitted below-minimum bids at the First Auction, based upon a spur-of-the-moment rule change. At the time Mr. Lawrence's letter was written, Plaintiffs had not discovered that there had been no authorizing resolution for such a last minute rule change. That letter was supplemented just 3 days later

BAXTER BRUCE & SULLIVAN P.C.
P.O. Box 32819, Juneau Alaska 99803
Ph: (907) 789-3166
Fax: (907) 789-1913

*Joergen Schade and Robert Merrell v. Ketchikan Gateway Borough and Charles Pool*
**Plaintiffs' Reply to Defendants' Oppositions to Motion for Injunctive Relief; Page 2 of 15; Case No. J05-0017 CV (RRB)**

1  change was not advertised,[5] resulting in some people not attending, as some of
2  the Assembly members noted. *See* KGB Response, Exhibit 7, p. 19-20, and 27-
3  28; *see also* Merrell Aff. at ¶ 5.

    b. The Assembly never even considered Merrell's written offer dated August 10, 2005, of $934,830 for B-17. There is no record that it was ever brought before the Assembly at its meeting on August 15, 2005 or at any other meeting. His earnest money of $50,000 was returned without comment on August 17, 2005. *See* KGB Response, Exhibit 7; *compare* Merrell Aff., Exhibits A-C.

    c. The second auction, advertised as a competitive 30 day bid process (the "Second Auction"), which was to end on September 20, 2005, had already been underway for approximately two weeks before Resolution 1906, Amended (the "Second Resolution"[6]) authorizing the rights of first refusal, was passed on September 6, 2005.[7] *See* KGB Response, Exhibit 8-11.

---

(10/03/05), specifically pointing out the lack of any authorizing resolution. *See* Schade Aff., Exhibit E. Therefore, no such concession has been made. Plaintiffs' pleadings consistently point out the absence of any such authorizing resolution.

[5] At pp. 19 and 20 of Exhibit 7 to KGB's Response, the transcript of the 8/15/05 meeting shows that Assembly member Painter observed, "*Are you aware that there are people that did not attend the auction, because they didn't realize that the Borough would accept offers of bids less than the assessed opening value?...And those people are calling us.*" Assembly member Stone responded, "*Yeah, we were very much aware of that. And we knew we were kind of opening up a can of worms.*" At pp. 27 and 28 of Exhibit 7 to KGB's Response, Assembly member Thompson admitted, "*...what I'm saying is that – you know, that wasn't advertised so the public couldn't have any fore knowledge that that would happen. And if we intend to have auctions in the future with minimum bids, you can just forget about it if you're going to accept minimum bids at an auction, and then just rubber stamp them, you know in an Assembly meeting later on. We might just as well throw it out for a free for all.*" (this is a particularly telling comment, since Thompson was the one who later moved to give the rights of first refusal (KGB Response, Exhibit 7, p. 31) and even later referred to out-of-state purchasers as "carpet baggers." KGB Response, Exhibit 16, p.23. Merrell was in fact one of those people who did not attend the First Auction because he was unaware of the rule change. Merrell Aff. at ¶ 5. Contrary to KGB's argument, these facts clearly support the claim for estoppel, as well as the claims for abuse of discretion and denial of equal protection.

[6] KGB, in its Response at p.13, misapprehends Plaintiffs' argument regarding the Second Resolution. Plaintiffs do not contend that the Second Resolution lacked sufficient formality. Its defects are more substantive. The Second Resolution is defective because it adopts the improprieties of the First Auction—i.e., using the unauthorized bids from that auction as the minimum bids in the Second auction, coupled with a free right of first refusal in favor of those who had placed the unauthorized bids.

[7] In footnote 9 of his Response, Pool misstates that Plaintiffs claimed the proposal for a right of first refusal was first presented at the meeting of September 6, 2005. That is not true. Plaintiffs never made any such claim. They have claimed only that the amendment adopting such right of first refusal was not passed by the Assembly until September 6, 2005, which is true. *See* ¶ 19, First Amended Complaint. KGB agrees. *See* KGB Response at Exhibit 8, p. 3. In footnote 10 on p.7 of his response, Pool charges a most "blatant misrepresentation to the

BAXTER BRUCE & SULLIVAN P.C.
P.O. Box 32819, Juneau Alaska 99803
Ph: (907) 789-3166
Fax: (907) 789-1913

*Joergen Schade and Robert Merrell v. Ketchikan Gateway Borough and Charles Pool*
**Plaintiffs' Reply to Defendants' Oppositions to Motion for Injunctive Relief; Page 3 of 15; Case No. J05-0017 CV (RRB)**

  d. The bid documents circulated were never amended to disclose the inclusion of rights of first refusal (or at least no such change was provided to Plaintiffs).[8] No amendment of the bid documents was attached to KGB's response or cited by Pool. In fact, Pool's signed Bidder's Form reflects "No addendums." *See* KGB Response Exhibit 12, p. 5.

  e. The sub-market bids, never authorized by Assembly resolution, that were received from the First Auction were in fact used as the new minimum bids for the second auction, concluding on September 20, 2005, (the "Second Auction"), coupled with a right of first refusal in favor of those bidders. No consideration for granting rights of first refusal has been cited. *See* KGB Response, p. 4 and Exhibits 8; Pool—no cites.

  f. Neither KGB nor Pool deny Plaintiffs' allegation, made upon information and belief,[9] that the bidders from the First Auction who received rights of first refusal in the Second Auction were area residents. They merely dodge the issue by saying Plaintiffs have not proved it. *See* KGB Response, p. 24; *see* Pool Response, p.6 at footnote 6. Presumably, as the recipient of those bids, KGB would be in a position to know, one way or the other. Even Pool, as an area resident, and very closely aligned with KGB,[10] would be in a better position than Plaintiffs to know.

---

Court" based upon his review of transcripts of the meetings. Plaintiffs misrepresented nothing. They merely alleged their belief that the discussions in those meetings, and "even later Assembly meetings," (*see* Plaintiffs' Memorandum at p. 8) may hold clues to favoritism that seemed evident to them. In fact, the Assembly members' comments at the August 15, 2005, meeting are indeed enlightening. *See* KGB Response, Exhibit 7, and discussion at footnote 5 above. Obviously, officials in public settings are usually unlikely to openly admit such a bias. However, in one later meeting, on the eve of the Second Auction, one such statement was made, applying the slur "carpetbaggers" to refer to out-of-state purchasers of property in Ward Cove, whether or not for this particular transaction. More importantly, one of the Plaintiffs, Merrell, had in fact recently been seeking to purchase the very property KGB now says was the subject of the comment—in West Ward Cove. *See* Merrell Aff., Exhibits A and B, and also KGB's response in its letter of 8/17/05 (Merrell Aff. Exhibit C) specifically acknowledging that. Thus, it seems Plaintiffs' belief regarding possible clues from the meeting discussions, indicating hostile attitudes toward outsiders, was not an unreasonable one. *See also* discussion at footnote 17.

[8] *See* discussion at footnote 5 above.

[9] *See* ¶ 16, First Amended Complaint.

[10] Interestingly, in his Response, Pool "assumes the mantle" of KGB and presumes to argue its position, despite the fact that KGB is a party and ably represented by its own counsel. *See, e.g.,* Pool Response at p. 14-15, where

BAXTER BRUCE & SULLIVAN P.C.
P.O. Box 32819, Juneau Alaska 99803
Ph: (907) 789-3166
Fax: (907) 789-1913

   g. By a substantial margin, Plaintiffs, both out of state residents, were the highest and second highest bidders, respectively, for Parcel B-17 at the Second Auction. *See* Schade Aff., Exhibit C, letter of KGB to Schade, dated September 27, 2005.

   h. The holders of the right of first refusal had no incentive to bid, and did not bid, higher than they had done at the First Auction after the unauthorized change in the rules. *See* Pool Response, Exhibit B; KGB Response, Exhibit 12, pp. 5-6.

   i. Only by hearsay on the eve of the concluding day of the Second Auction did Plaintiffs learn that there *might be* rights of first refusal. *See* KGB Response at p.4, footnote 3, citing Plaintiffs' admitted receipt of "actual notice," without citing or referring to the timing, manner, or source of such notice. In fact, neither Plaintiff was provided *by KGB* with notice of such fact. (*e.g.,* no confirmation from KGB through addenda to the bid documents was ever given. *see* Plaintiffs' Reply, subparagraph d, above. To the contrary, assurances to Merrell were given by KGB that there were none. *See* Merrell Aff., ¶ 8). The trip to Ketchikan by Schade and Merrell's representative had already been made.  *See* lack of denial, KGB Response, p. 4. Pool Response—no cites; *Compare* Schade's Aff. ¶ 13 and Merrell Aff., ¶ 8-9.

2. Almost as telling are the tacit admissions. Those include:

   a. KGB applied no discretion or judgment in deciding to whom the property should be conveyed. *See* KGB Response, p. 17, footnote 7. It was simply a mechanical application of who had the highest bid and whether that bid was matched by the local holder of the right of first refusal. Consequently, KGB cannot now be heard to argue that it made a considered and deliberate "best interest" determination that Mr. Pool's bid, though lower by more than $200,000, was actually the "highest and best offer" under the circumstances. Therefore, KGB must defend its action solely by claiming that the granting of these preferential rights, standing alone, is somehow consistent with free, fair, open competitive bidding. This KGB did not and cannot do. Nor can KGB

---

Pool presumes to know "KGB's primary reason for conducting the sale" and argues the damages to KGB as though he has special insight.

*Joergen Schade and Robert Merrell v. Ketchikan Gateway Borough and Charles Pool*
**Plaintiffs' Reply to Defendants' Oppositions to Motion for Injunctive Relief; Page 5 of 15; Case No. J05-0017 CV (RRB)**

even suggest that it received any consideration for the granting of these preferential rights.

b. The only rationale offered in KGB's response for granting the preferential rights was twofold: (1) not to "take points off the scoreboard" and (2) that the granting of rights of first refusal had been done once before, not by KGB but for KGB.

i. The first argument is belied by Merrell's offer.[11] Even after the rejection of Pool's bid, KGB had in hand, shortly before granting these preferential rights, a much higher "score" to keep on the "board"—higher by nearly $350,000--and to use as a minimum bid. KGB's conclusory comment, relegated to a footnote, suggests that Merrell's offer was really just "subject to negotiations" and therefore not an unequivocal offer. *See* KGB Response, p.18, footnote 10. The argument is not well-taken. The offer was in writing and is before the Court for its review. The offer was serious, firm, supported by earnest money of $50,000, and accompanied by written explanations of Mr. Merrell's genuine interest in the Ketchikan area. *See* Merrell Aff., Exhibits A and B. By contrast, Mr. Pool's bid was not supported by earnest money, was admittedly below market value (according to KGB in the recitations of the Second Resolution), and was not even authorized by the First Resolution (or indeed any other resolution).

ii. The second argument ("it's been done once before") is equally facile. The unsupported conclusion would then be "...so it must be OK to do it again." It almost invites the equally glib reply, "two wrongs don't make a right." Assuming the two situations are comparable, the fact that no one may have challenged the prior action serves as no justification at all. Moreover, KGB failed to provide enough facts to determine whether the

---

[11] This would be true even assuming Pools' already-rejected bid could legitimately be considered "points on the scoreboard," still at risk of being taken off. The only way KGB would know the points were actually "still on the board" would be because of a close connection with the bidders, including Mr. Pool.

*Joergen Schade and Robert Merrell v. Ketchikan Gateway Borough and Charles Pool*
**Plaintiffs' Reply to Defendants' Oppositions to Motion for Injunctive Relief; Page 6 of 15; Case No. J05-0017 CV (RRB)**

BAXTER BRUCE & SULLIVAN P.C.
P.O. Box 32819, Juneau Alaska 99803
Ph: (907) 789-3166
Fax: (907) 789-1913

situations were truly comparable.[12]  For example, the reference to Alaska Housing[13] as the grantor appears to refer to the state agency, whose disposition of land would be governed by statute,[14] which specifically allows preferences under certain strict circumstances.  *See* discussion in Plaintiffs' Memorandum at 5-6.  No such statute applies to the facts here.

c. Of particular interest is Exhibit A to Pool's Response.  Pool represents Exhibit A to be a First Auction Bid Packet.  *See* Pool Response at p.10.  However, the Bid Packet appears to be attached as Exhibit C.  Instead, Exhibit A appears to be a document entitled "Ketchikan Gateway Borough Agreement For Auction Sale of Real Property" for B-17.  Exhibit A is dated "August 4, 2005," the date of the First Auction.   In it, Pool has marked up various changes to a pre-printed document and signed or initialed them.  One handwritten note signed by Pool says, "Deposit to be made upon acceptance of this bid by Borough Assembly.  C. Pool."  He makes additional marks on p. 4 of the document which have the affect of changing the paragraph concerning "**ENVIRONMENTAL RESPONSIBILITIES**."  Then, by making the seemingly innocuous "¶" insertion in two places, seeks to relieve himself of the obligation to include the paragraph regarding environmental responsibilities in any future lease, sale, or conveyance.

Several observations must be made.

  i. This does not appear to be part of any bid packet circulated or given to Plaintiffs or other bidders for the First Auction.
  ii. This does not appear to be a bid submitted on a bidder's form, but rather the next step—the contract of sale, after the bid has purportedly been won.

---

[12] The only document attached was a cryptic letter from Alaska Housing Finance Corporation which gave no details.  *See* KGB Response, Exhibit 15.

[13] *See* KGB Response, Exhibit 7 p. 29.

[14] AS 38.05.035

BAXTER BRUCE & SULLIVAN P.C.
P.O. Box 32819, Juneau Alaska 99803
Ph: (907) 789-3166
Fax: (907) 789-1913

*Joergen Schade and Robert Merrell v. Ketchikan Gateway Borough and Charles Pool*
**Plaintiffs' Reply to Defendants' Oppositions to Motion for Injunctive Relief; Page 7 of 15; Case No. J05-0017 CV (RRB)**

      iii. It may suggest a deal already in the works or being negotiated between KGB and Mr. Pool as of 8/04/05, or at least Pool's expectation of same, to which Plaintiffs and the other bidders were neither privy nor aware.

      iv. At a minimum, the document shows that Defendants' arguments about Merrell's offer, after the First Auction, being "equivocal" or "not comparable," are somewhat disingenuous. Obviously, Pool was himself in a negotiating mode, making significant changes, even in the context of the First Auction.

      v. Although the above questions are intriguing, none is necessary to a finding that injunction is the appropriate remedy here—rather, each is just cumulative of the many questions raised by Defendants' conduct.

3. Next, Defendants place great reliance upon the deference the courts pay to various legislative bodies under the concept of separation of powers. Clearly, the courts do not seek to substitute their judgment for that of the legislative body regarding the wisdom of a piece of legislation. However, the wisdom of legislation is not what is involved here. Rather, arbitrary and/or capricious conduct is. The courts have made clear that their deference does not extend to such conduct. Therefore, KGB ignores at its peril the unquestioned propriety of the courts' role in determining whether a legislative or administrative action was an abuse of discretion. As merely one example, KGB's failure even to consider the written offer by Merrell when establishing the new minimum bid for B-17 demonstrates the arbitrary nature of its action. The Alaska Supreme Court has found that the failure of the Anchorage municipal appraiser to consider prices paid by taxpayers for their lots when determining market value for tax purposes was arbitrary and the Court set aside the appraisals, ordering new appraisals that took into account those sales. <u>CH Kelly Trust v. Municipality of Anchorage</u>, 909 P.2d 1381, 1382 (Alaska 1996).

4. KGB's action demonstrated the ultimate caprice, however, when the Second Resolution adopted Pool's number as the new minimum bid and then went further by granting Pool, for no consideration whatsoever, a right of first refusal at that or any higher amount that might be bid by others. *See* KGB Response, Exhibit 8, p. 2, the Second

BAXTER BRUCE & SULLIVAN P.C.
P.O. Box 32819, Juneau Alaska 99803
Ph: (907) 789-3166
Fax: (907) 789-1913

*Joergen Schade and Robert Merrell v. Ketchikan Gateway Borough and Charles Pool*
**Plaintiffs' Reply to Defendants' Oppositions to Motion for Injunctive Relief; Page 8 of 15; Case No. J05-0017 CV (RRB)**

Resolution, §§ 1 B and 1 C. That means that free and fair competitive bidding by any other bidder was decidedly stifled. Bidders were effectively discouraged from making as high an offer as might otherwise be expected, because of the ever-present contingency that the offer could be "trumped," not by a higher offer, but by a preemptive right of first refusal granted to a local resident who was not even required to submit a new bid. Both Mr. Schade and Mr. Merrell have so testified,[15] and Mr. Merrell's actions in making a higher offer before the Second Auction back up that testimony.[16]

5. Other jurisdictions have held that conditions stifling or chilling the bidding at a public auction are legitimate grounds for challenging such sales. *See, e.g.*, Schwartz v. Capital Savings & Loan, 381 N.E.2d 957 (Ohio App. 1978). In Schwartz, the court, explaining its reasons for reversing the lower court's dismissal of the complaint challenging a sale at public auction, noted:

> "Inasmuch as competitive bidding is the essence of an auction sale, such sale must be conducted openly and fairly with full and free opportunity for competition among all prospective bidders. *Conduct or artifice which has as both its purpose and effect to stifle fair competition and chill the bidding is against public policy*." Schwartz, 381 N.E.2d at 959 (*emphasis added*).

*See also* State v. Cate, 371 S.W.2d 541 (Arkansas 1963) (holding that a sale at public auction of a parcel subject to a lease which contained an option to purchase stifled the bidding).

6. Therefore, one logical explanation for KGB's action is deliberate manipulation behind the scenes to make sure the local favorites held trump cards, while conducting a sale under the guise of a fair and public competitive bid process. It is rare that officials will publicly admit to such bias. Thus, while intemperate comments by officials may occasionally surface (such as the epithet, "carpetbaggers," applied by the Assembly

---

[15] *See* Schade Aff. at ¶ 15; Merrell Aff. at ¶ 9.

[16] *See* Merrell Aff. at ¶¶ 5 and 6.

*Joergen Schade and Robert Merrell v. Ketchikan Gateway Borough and Charles Pool*
**Plaintiffs' Reply to Defendants' Oppositions to Motion for Injunctive Relief; Page 9 of 15; Case No. J05-0017 CV (RRB)**

BAXTER BRUCE & SULLIVAN P.C.
P.O. Box 32819, Juneau Alaska 99803
Ph: (907) 789-3166
Fax: (907) 789-1913

member to one or more out-of-state parties seeking to purchase Ward Cove property[17]) and certainly do provide a revealing glimpse into KGB's attitude of favoritism, the full extent of that attitude may have to be ferreted out by discovery. Interestingly, the Assembly member who made the comment, Mr. Thompson, was the same one who had previously moved to amend the original Resolution 1906 to include the rights of first refusal and also made some rather telling admissions about the effect of the last minute rules change at the First Auction[18]

7. Nevertheless, even if KGB's actions were not intentionally motivated by favoritism,[19] the actions were at the very least arbitrary and therefore subject to judicial review and correction. *See, e.g.,* CH Kelly Trust v. Municipality of Anchorage, 909 P.2d 1381, 1382 (Alaska 1996); Brown v. City of Phoenix, 272, P.2d 358 at 364 (Arizona 1954).

### Irreparable Harm to Plaintiffs

8. KGB contends that Plaintiffs' allegations of irreparable harm from conveyance to Pool are conclusory. Although it is true that Plaintiffs have alleged irreparable harm in a general fashion (¶ 52, First Amended Complaint), the Count for Injunctive Relief incorporated all previous allegations (¶¶ 1-51, First Amended Complaint), and the grounds for that harm are alleged throughout the pleading and are further supported in the memorandum and affidavits of the Plaintiffs. Those grounds include not only (a) the principle that real estate is unique and the loss of real property rights generally

---

[17] Relying on the transcript, KGB claims the comment "carpetbaggers" is unrelated to this *particular* transaction. Even so, the comment is still clearly relevant. KGB does not mention in its response, for example, that Merrell was actually one of the parties who had made a proposal for the waterfront properties on the west side of Ward Cove that were referred to in the transcript. *See* Merrell Aff., Exhibits A-C. Merrell's competition was another out-of-state prospective buyer, Mr. Ted Falconer of Renaissance Prospect Group, an Arizona LLC. KGB Response, Exhibit 4, pp. 13-14. Moreover, the context of the comment appears to apply to out-of-state buyers in general. For example, this transaction was discussed in the same meetings as the sales of other waterfront property, including B-17, on the east side of Ward Cove. The bottom line is that such an attitude obviously existed toward out-of-state purchasers, period. Nevertheless, Defendants attempt to draw a distinction, but fail to explain how that attitude would have been any different toward out-of-state purchasers of parcels on the east side of Ward Cove, including B-17, than it was toward out-of-state purchasers on the west side. The actual statement was "…*with these guys from down south or wherever they are from, because I like to refer to them as the carpet baggers*…." *See* KGB Response, Exhibit 16, p. 23.

[18] *Compare* KGB Response, Exhibit 7 at pp. 27, 28 and 31, and Exhibit 16 at p. 23.

[19] A discriminatory purpose is only necessary for the equal protection claim, not for the abuse of discretion and estoppel claims.

*Joergen Schade and Robert Merrell v. Ketchikan Gateway Borough and Charles Pool*
**Plaintiffs' Reply to Defendants' Oppositions to Motion for Injunctive Relief; Page 10 of 15; Case No. J05-0017 CV (RRB)**

results in irreparable harm,[20] but also (b) the fundamental fairness of the bidding process, the denial of which also causes irreparable harm to the bidders.[21]

9. As to the first ground, Pool has conceded in his affidavit that the parcel is unique, arguing irreparable (or at least "unquantifiable") harm to himself if he does not receive the conveyance. *See* Pool Aff. at ¶¶ 28-29.

10. As to the second ground (and perhaps also the first), Defendants argue that Plaintiffs lack a legal interest in the property. Plaintiffs admit they do not currently have a legal ownership interest in the property, but are just bidders, albeit the high bidders in the Second Auction.[22] But to accept Defendants' premise, one would have to concede that a municipality may do just as it pleases in a public auction of its property, disregarding

---

[20] *See, e.g.,* Dixon v. Thatcher, 742 P.2d 1029 at 1030 (Nev. 1987) ("Because real property and its attributes are considered unique and loss of real property rights generally results in irreparable harm, the district court erred in holding otherwise."); Wal-Mart Stores, Inc. v. County of Clark, 125 F.Supp.2d 420 (D. Nev. 1999) (citing Dixon); Karl Suleman Enterprises v. George, 2004 WL 3255486 (N.D. Cal. 2004) (citing Dixon).

[21] The unfairness of the bid process and Plaintiffs' right to participate in a fair, competitive process is raised throughout Plaintiffs pleadings and its papers seeking injunctive relief. By way of example only, *see* ¶ 43, First Amended Complaint, Schade Aff. at ¶¶ 13-15 and 20, and Merrell Aff. at ¶¶ 9-12. Case law in other jurisdictions shows that the denial of the right to participate in a fair bidding process establishes irreparable harm. *See, e.g.,* Mathiowetz Construction Co. v. Minnesota Department of Transportation, 137 F. Supp.2d 1144 at 1149-1150 (D. Minn. 2001) ("To the extent that Mathiowetz can demonstrate that the Defendants' allegedly offensive conduct tainted the bidding process, i.e., the MRP actually affected the bid submitted by SMC, Mathiowetz will suffer irreparable harm if the contract is awarded to and the project is completed by SMC without Mathiowetz first having an opportunity to participate in a fair bidding process. This harm is in no way dependent upon a showing that Mathieowetz would have been awarded the contract but for the alleged impropriety; the harm is derived from the very existence of the impropriety itself."); *cf.*, National Maritime Union of America v. Commander, Military Sealift Command, 824 F.2d 1228, 1237 (D. C.Cir. 1986) ("A disappointed bidder that claims illegality in a procurement alleges an economic injury beyond its economic loss of the contract" and an injury "to its right to a legally valid procurement process....This right is implicitly bestowed on all bidders...by the contractual invitation to bid embodied in the solicitation."); United Technologies Communications Company v. Washington County Board, 624 F. Supp. 185 at 188 (D. Minn. 1985) ("...the loss of the chance to participate in a fair bidding process raises a significant threat of irreparable injury to the plaintiff. The only true remedy for such injury is to issue the injunction sought by the plaintiff."); *but see* Big Country Foods, Inc. v. Board of Education of Anchorage School District, 868 F.2d 1085 (9th Cir. 1989) (where the Court declined to consider the theory raised under United Technologies because the theory was raised for the first time on appeal in a reply brief); Funderburg Builders, Inc. v. Abbeville County Memorial Hospital, 467 F.Supp. 821at 825 (D. S.Ca. 1979) ("... it is clear that an injunction and declaratory judgment are the only adequate means of protecting the public interest, the integrity of the competitive bidding process, and the rights of the individual bidder."); Keefe-Shea Joint Venture v. City of Evanston; 773 N.E.2d 1155 at 177 ("...recouping the bid costs does not stop the improper governmental action. The harm to bidders and the public will continue unabated unless the governmental body is enjoined from maintaining an unfair bidding process").

[22] And that , but for the illegal right of first refusal granted, the higher of the two Plaintiffs' bids, Schade's, would have resulted in his current legal ownership.

BAXTER BRUCE & SULLIVAN P.C.
P.O. Box 32819, Juneau Alaska 99803
Ph: (907) 789-3166
Fax: (907) 789-1913

*Joergen Schade and Robert Merrell v. Ketchikan Gateway Borough and Charles Pool*
**Plaintiffs' Reply to Defendants' Oppositions to Motion for Injunctive Relief; Page 11 of 15; Case No. J05-0017 CV (RRB)**

fairness, propriety, or any other consideration.[23] Why?—because, according to Defendants' theory, any harmed parties would be merely "bidders," without any actual legal interest in the property, with no standing to complain or to enjoin an improper sale or award. That is not the law, as the cases of <u>Schwartz v. Capital Savings & Loan</u>, 381 N.E.2d 957 (Ohio App. 1978), <u>State v. Cate</u>, 371 S.W.2d 541 (Arkansas 1963), and <u>Brown v. City of Phoenix</u>, 272, P.2d 358 (Arizona 1954) as well as the authorities discussed in footnote 21, clearly demonstrate. Otherwise, how then would improprieties committed by municipalities in such sales ever be stopped? *See* <u>Keefe-Shea Joint Venture v. City of Evanston</u>; 773 N.E.2d 1155 (Ill. App. 2002) ("...recouping the bid costs does not stop the improper governmental action. The harm to bidders and the public will continue unabated unless the governmental body is enjoined from maintaining an unfair bidding process").

### Harm to the Public

11. Apart from the irreparable harm to Plaintiffs, the public will be irreparably harmed unless this arbitrary process is set right. The public has a legitimate stake in making sure its local government does not abuse the process in public auctions. <u>Funderburg Builders, Inc. v. Abbeville County Memorial Hospital</u>, 467 F.Supp.821 at 825 (D. S.Ca. 1979) ("... it is clear that an injunction and declaratory judgment are the only adequate means of protecting the public interest, the integrity of the competitive bidding process, and the rights of the individual bidder.") As noted above, Courts have held that free, fair, competitive bidding is the very essence of a public auction and that artifice or conduct which stifles bidding is against public policy. <u>Schwartz v. Capital Savings & Loan</u>, 381 N.E.2d 957 at 959 (Ohio App. 1978). And even apart from the important issue of public policy, the public will also have suffered actual monetary harm if the conveyance to Pool is allowed to stand. This loss is not speculation—it is fact. Before the auction, Merrell offered more than $100,000 above the amount Pool now is expected to pay. Merrell's offer was ignored and rejected out of hand. *See* Merrell Aff.,

---

[23] Pool argues that KGB could have sold its public land to him without competitive bid. *See* Pool Response at 13. Whether that is true, KGB elected to sell the property at public auction. Therefore, KGB is required to see that the competitive bidding process is fair. *See* <u>Keefe-Shea Joint Venture v. City of Evanston</u>; 773 N.E.2d 1155, 1165 (Ill. App. 2002)

Exhibits A-C. Schade has shown that he was prepared to bid higher at the Second Auction than he did (actual bid of $815,000), had he not belatedly learned through rumor of the possible existence of a right of first refusal, given for no consideration whatsoever, to bidders who benefited from the putative, unadvertised, unauthorized, last-minute rule change at the First Auction. *See* Schade Aff. at ¶ 15. Merrell, was shocked when he heard the rumor of such a potential right, but relied instead on the previously given assurance from KGB that there were no addenda to the bid documents. *See* Merrell Aff. at ¶¶ 8-9. Further, the public (including KGB citizenry) has been and continues to be harmed by a process which allowed Pool this free, unadvertised right where property's assessed value by KGB was $1,090,700,[24] nearly twice the bid value by Pool. The evidence shows that Pool was then given a period of weeks,[25] at public expense, to use this no-risk option to start to seek out lucrative potential leases for the property. Presumably, the KGB public might be interested to know that its government was prepared to let this public property go to Pool through this questionable procedure for as little as $600,000—a property which Pool, through his own affidavit, now claims may produce an almost immediate income stream of $120,000 to $180,000 in gross rent annually (or between $1.2 million and $1.8 million over a 10 year lease).[26]

### Harm to KGB and Pool

12. While their claims of the harm they will suffer from the issuance of an injunction appear significantly overstated,[27] Defendants identify nothing that cannot be addressed by appropriate security as provided for in Federal Rule 65. Pool contends that he will be harmed because this parcel would otherwise enhance his ownership of other property across North Tongass Highway on the uplands side. *See* Pool Aff. at ¶¶ 29. However, Plaintiff Schade has a greater concern in that regard. He now owns four other

---

[24] *See* KGB Response, Exhibit 1, p.4.

[25] *See* letter dated August 26, 2005, from KGB to Pool (Pool Response, Exhibit B), notifying him of the right of first refusal (even before the Second Resolution containing that right was passed on September 6, 2005. KGB Response, Exhibit 8, p. 3).

[26] See Pool Aff., ¶¶ 21, 22 and 27.

[27] For example, after waiting for months to allow Mr. Pool to close when *he* deemed it convenient for *his* tax purposes, KGB stretches credibility by suggesting a further delay will somehow cause it serious damage. *See* Schade Aff., Exhibit H.

*Joergen Schade and Robert Merrell v. Ketchikan Gateway Borough and Charles Pool*
**Plaintiffs' Reply to Defendants' Oppositions to Motion for Injunctive Relief; Page 13 of 15; Case No. J05-0017 CV (RRB)**

properties even closer to B-17[28] and was counting on enhancing the value of those properties with this parcel. *See* Schade Aff. at ¶¶ 12-13. If Pool is allowed to proceed to take title, he obviously intends to lease the property,[29] meaning that by the time a hearing on the merits could be held, the long-term lease may be in place, making it impractical to remove the lessee and to address its rights, if any. Addressing a similar balancing of hardships, the Court in Keefe-Shea Joint Venture v. City of Evanston; 773 N.E.2d 1155 (Ill. App. 2002) noted at page 178:

> "In the absence of a preliminary injunction in this case, DiPaolo would begin work on the project despite the fact that the plaintiff has established a *prima facie* case as to Evanston's improper awarding of the contract for the project to DiPaolo. By the time a hearing on the merits could be held, the project would be long under way, making it impractical to remove DiPaolo from the project. In other words, based upon the record before us, the lack of a preliminary injunction operates to deprive the plaintiff of a right to which it has made a *prima facie* case of entitlement. ...[T]he plaintiff would suffer the greater hardship if the preliminary injunction was denied and therefore, a preliminary injunction is necessary to preserve the status quo."

13. KGB is not truly harmed because it would have received the same proceeds of the sale from Schade, and may have received them sooner.[30] KGB's decision to allow Pool to delay the closing for his own tax reasons can only be laid at its own feet. In fact, had KGB acted appropriately, Merrell's offer before the auction could have been used as the minimum bid, meaning that KGB and its citizens would likely have received over $100,000 more. In any event, any real harm that may be suffered for a period of a 10 day TRO would be extremely minor.[31] Moreover, if a preliminary injunction is later issued, an appropriate bond or cash in lieu of bond can be fairly set to secure KGB.

---

[28] on the same side of North Tongass Highway -- see location of properties in KGB Response, Exhibit 1, Resolution 1881.

[29] *See* Pool Aff. at ¶19.

[30] Schade never made his bid contingent on delaying the closing until after the first of the year.

[31] As to Pool, perhaps the biggest indicator of his outlandish position is his insistence on a $2.7 million dollar bond (which is more than three (3) times the amount he will actually pay for ownership of the property) just to protect his interest *if a TRO is granted* (i.e., for a 10 day delay). *See* Pool Response at p. 18.

*Joergen Schade and Robert Merrell v. Ketchikan Gateway Borough and Charles Pool*
**Plaintiffs' Reply to Defendants' Oppositions to Motion for Injunctive Relief; Page 14 of 15; Case No. J05-0017 CV (RRB)**

BAXTER BRUCE & SULLIVAN P.C.
P.O. Box 32819, Juneau Alaska 99803
Ph: (907) 789-3166
Fax: (907) 789-1913

## Conclusion

14. For the foregoing reasons, as well as those advanced in Plaintiffs' motion, supporting affidavits and memorandum, Plaintiffs' request for injunctive relief in the initial form of a temporary restraining order, with expedited discovery from Defendants pending an evidentiary preliminary injunction hearing, should be granted. At the appropriate time, these documents will also support the issuance of a preliminary injunctive relief pending trial, and, if necessary, permanent injunctive relief following trial.

DATED this 10th day of January, 2006.

BAXTER BRUCE & SULLIVAN P.C.

By  s/ Richard L. Nelson
       Richard L. Nelson, ABA No. 0209036
       Attorneys for Plaintiffs

**CERTIFICATE OF SERVICE**

I hereby certify that on this 10th day of January, 2006, a copy of the foregoing was served electronically on Scott Brandt-Erichsen, and on Mitchell A. Seaver, 344 Front Street, Ketchikan, Alaska 99901, and Geoffrey Currall, Keenan & Currall P.C., 540 Water St. Suite 302, Ketchikan 99901 by facsimile and regular mail.

s/ Richard L. Nelson

BAXTER BRUCE & SULLIVAN P.C.
P.O. Box 32819, Juneau Alaska 99803
Ph: (907) 789-3166
Fax: (907) 789-1913

*Joergen Schade and Robert Merrell v. Ketchikan Gateway Borough and Charles Pool*
**Plaintiffs' Reply to Defendants' Oppositions to Motion for Injunctive Relief; Page 15 of 15; Case No. J05-0017 CV (RRB)**